DONALD WILLIAMS

V

GRAND RAPIDS PUBLIC LIBRARY

File No. 1:06-cv-0635

# EXHIBIT C

**to**

***BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
UNDER AUTHORITY OF FED.R.CIV.P. 56(b)(c)***

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4        _____

5    DONALD WILLIAMS,

6              Plaintiff,

7    v                        Case No:  1:06-CV-0635
                              Hon. Robert Holmes Bell
                              Chief, U.S. District Judge
8
     GRAND RAPIDS PUBLIC LIBRARY,

9                                      RECEIVED
              Defendant.

10                                     MAY 3 1 2007

11       _____        OFFICE OF CITY ATTORNEY

12

13

14           DEPOSITION OF DONALD WILLIAMS
     taken before Shawn M. Breimayer, Certified Shorthand Reporter,
15   at the office of GRAND RAPIDS CITY ATTORNEY, 300 Monroe Ave,
     NW, 620 City Hall, Grand Rapids, MI, Friday, May 18, 2007,
16   commencing at 9:00 AM, pursuant to notice.

17   APPEARANCES:

18
     FOR THE PLAINTIFF:  In Pro Per
19

20
     FOR THE DEFENDANT:  Daniel A. Ophoff (P23819)
21                       300 Monroe Ave, NW
                         620 City Hall
22   COPY                Grand Rapids, MI   49503
                         (616) 456-4023
23

24   Reported by:  Shawn M. Breimayer, CSR (6888)

25

DEPOSITION OF DONALD WILLIAMS
5-18-07

1                    TABLE OF CONTENTS

2    WITNESSES:                                    PAGE
          DONALD WILLIAMS
3              (Direct Examination by Mr. Ophoff)      3

4

5

6

7

8

9

10

11

12    EXHIBITS:                                    MARKED
          DEPOSITION EXHIBIT 1                        49
13             (Layout of Grand Rapids Public Library)
          DEPOSITION EXHIBIT 2                        64
14             (Suggestion form)
          DEPOSITION EXHIBIT 3                        91
15             (Affidavit of Donald Williams)

16

17

18

19

20

21

22

23

24

25

**3**

(Deposition commenced at 9:00 AM)

MR. OPHOFF: This is the deposition of Donald Williams taken in the matter of Donald Williams versus the Grand Rapids Public Library, case number 1:06-CV-0635. Today is May 18, 2007. It's about 9:00 o'clock. This is the date and time scheduled for the deposition of Mr. Williams. Mr. Williams appears. He is in pro per. He's unrepresented at this point.

My name is Daniel Ophoff. I'm the attorney representing the Grand Rapids Public Library and City of Grand Rapids in the matter. Mr. Williams, have you ever had your deposition taken before?

THE WITNESS: Yes, once before in Oklahoma. I filed a lawsuit against Oklahoma City Housing Authority, of which they took my deposition.

MR. OPHOFF: Okay. The first thing I want you to do is kind of a housekeeping thing. The fact that you're here today suggests that my letter, which enclosed the subpoena and the notice of depositions, got to you okay, and you received the letter and the notice in the mail.

THE WITNESS: Yes, I did.

MR. OPHOFF: Okay. So you received adequate notice to get here today, and you are appearing here today for the purposes of your deposition.

**4**

THE WITNESS: Yes, I am.

MR. OPHOFF: Okay. What I'd like to do before we get started is just go over a couple grounds rules. What we're going to do today is talk about your lawsuit against the City of Grand Rapids and the Public Library, and I'm going to ask you a series of questions. And those questions will require some answer or response from you, and those answers and my questions will be taken down by the court reporter. So one of the things that's going to be very important is that you give me audible responses to my questions.

THE WITNESS: I will, yes, sir.

MR. OPHOFF: So she's able to take down the answers and we'll be able to have something called a transcript after this deposition gets done.

THE WITNESS: Yes, sir.

MR. OPHOFF: A transcript is and will be a written record of everything I say and that you say here today. And you are sworn so everything that you say needs to be the truth and will be used by the court as a record of your truthful statements; do you understand that?

THE WITNESS: Yes, sir.

MR. OPHOFF: Okay. If I ask you a question that you don't understand the most important thing for you

**5**

will be to ask me to rephrase the question so that you understand the question.

THE WITNESS: Yes, sir.

MR. OPHOFF: Is that agreeable?

THE WITNESS: That's agreeable.

MR. OPHOFF: If you answer the question we're going to assume that you understood the question and you intended your response.

THE WITNESS: Okay.

MR. OPHOFF: Okay.

THE WITNESS: May I say something?

MR. OPHOFF: Why don't we just get through this initial process.

THE WITNESS: All right.

MR. OPHOFF: One of the things that the deposition transcript is used for is discovery in a particular civil litigation context so that I can find out about the lawsuit, you know, and ask you questions about the lawsuit. This is going to be a little unusual because you're not represented by counsel here, and usually both sides get to ask questions.

I don't know exactly how we'll handle that at the end, but I guess if at the end you have something additional that needs to be said we'll offer you the opportunity to put that on the record; is that

**6**

agreeable?

THE WITNESS: Sure.

MR. OPHOFF: One of the things that a deposition transcript can be used for is at trial if your testimony comes in question the deposition transcript can be used as a prior record of what you said about this case; do you understand that?

THE WITNESS: Yes, I do.

MR. OPHOFF: So it's going to be very important for you to tell the truth and understand all the questions I ask of you; okay?

THE WITNESS: Yes, sir.

MR. OPHOFF: Now, do you have any other questions about the deposition process?

THE WITNESS: I do have one statement to make. That all your questions must pertain to the litigation and not ask me personal questions which are unrelated to the litigation.

MR. OPHOFF: Well, one of the things that I intend to do is ask you a fairly broad scope of questions, because I'm allowed to do that under the federal district court rules. I'm allowed to ask you far reaching questions, because the questions that I ask may be relevant evidence or might lead me to relevant evidence about you, and so, I'm going to ask

7

1  you broad based questions, some of which may not be
2  directly, in your mind, related to the litigation, but
3  they are going to be important for me. I'm not going
4  to ask you any questions that aren't important for me
5  and will not be important for purposes of litigation.
6       THE WITNESS: I want to make a rule more on of
7  I'm not going to allow you to question me concerning
8  anything unrelated to this litigation for impeachment
9  purposes or perjury statements or anything of the like.
10      MR. OPHOFF: Well, I think the best thing for us
11 to do at this point, Mr. Williams, is to proceed with
12 this; okay?
13      THE WITNESS: All right.
14      MR. OPHOFF: Judge Scoville is right next door,
15 and if I ask you questions that you refuse to answer
16 and I think are important what we'll do is we'll take a
17 break, I'll call over to Judge Scoville's chambers and
18 we'll go over and chat with him about exactly what you
19 have to answer and what you don't have to answer.
20      THE WITNESS: Yes, sir.
21      MR. OPHOFF: So we'll just do it that way. It
22 may take a little bit longer. We may need to take more
23 than one day the take your deposition, but I think it's
24 important for me to ask the questions that I need to
25 ask this morning. I think I've heard your computer

8

1  beep.
2       THE WITNESS: The battery is low.
3       MR. OPHOFF: Do you need to plug it in?
4       THE WITNESS: May I?
5       MR. OPHOFF: Yes.
6  (Witness plugging computer in approximately 9:06 AM)
7  BY MR. OPHOFF:
8  Q.  Please state your full name.
9  A.  Donald Verness Williams, Junior.
10 Q.  Would you spell your middle name for us, please?
11 A.  V-e-r-n-e-s-s.
12 Q.  And what is your current residence, Mr. Williams?
13 A.  44-1/2 South Division Street Southeast, Apartment 37
14     Grand Rapids, Michigan 49503.
15 Q.  And how long have you lived at this address?
16 A.  Six or seven years.
17 Q.  Okay. And before you lived at this address on South
18     Division, where did you live?
19 A.  Kentwood, Michigan.
20 Q.  Okay. And what address?
21 A.  I don't even remember the address.
22 Q.  Did you live in an apartment complex?
23 A.  An apartment.
24 Q.  Do you remember what street that it was on?
25 A.  No, sir.

9

1  Q.  Says in your complaint that you were born in the city
2       of Grand Rapids?
3  A.  Yes, sir.
4  Q.  Did you go to school in the city of Grand Rapids?
5  A.  Yes, I did.
6  Q.  Where did you go to school?
7  A.  I went to Vandenberg, Sigsby, Harrison Park, Ottawa
8       Hills.
9  Q.  Did you graduate from high school?
10 A.  No, I did not.
11 Q.  How many years did you go to high school?
12 A.  I dropped out of the tenth grade.
13 Q.  Do you have any time spent in the United States
14     military?
15 A.  Yes, I do.
16 Q.  Okay. And when did you join the military?
17 A.  December 6, 1973.
18 Q.  And did you join the military or were you drafted?
19 A.  I joined.
20 Q.  And what branch of the service did you join?
21 A.  Regular Army.
22 Q.  And how long were you in the military service?
23 A.  Three years.
24 Q.  And what was your job while you were in the Army?
25 A.  I was a communications specialist.

10

1  Q.  What was the highest rank that you achieved while you
2       were in the service?
3  A.  SP 4.
4  Q.  And what did you do as a communications specialist in
5       the Army?
6  A.  I was a top secret teletype operator for the 94th group
7       Air Artillery.
8  Q.  You said a top secret what?
9  A.  Telecommunications specialist. Teletype operator.
10 Q.  And where were you stationed?
11 A.  Kaiserslautern in Germany.
12 Q.  Could you spell that for us?
13 A.  No, I couldn't.
14 Q.  Whereabouts in Germany is Kaiserslautern?
15 A.  It's pronounced Kaiser Slaughtering.
16 Q.  Kaiserslautern?
17 A.  Kaiser Slaughtering.
18 Q.  Slaughtering?
19 A.  Yes.
20 Q.  Is that a town in Germany or a military base?
21 A.  It's a town in Germany near Frankfurt, maybe 50 miles
22     from Frankfurt.
23 Q.  And what type of duties would you have as a top secret
24     teletype operator?
25 A.  Communicating top secret messages from one concern to

11

1    another from Kaiserslautern to premises to Bodden
2    Bodden to different locations around the area.
3    Q. So these would be top secret messages that were sent to
4    other military installations?
5    A. Yes, sir.
6    Q. And what type oaf training did you have for this
7    particular job?
8    A. I graduated from Fort Gordon, Georgia.
9    Q. Was that basic training or was that training beyond
10   basic training?
11   A. That's beyond basic training.
12   Q. Where did you have your basic training?
13   A. Fort Knox, Kentucky.
14   Q. And how long were you at Fort Gordon, Georgia for your
15   more advanced training?
16   A. I believe it was three months. It might have been
17   four.
18   Q. How old were you when you joined the military?
19   A. Seventeen.
20   Q. How old were you when you dropped out of school?
21   A. I believe it was sixteen.
22   Q. And what was involved with the communication specialist
23   training that you received at Fort Gordon, Georgia?
24   A. They teach you how to encipher, decipher, type and
25   administrative, supervisory, management skills.

12

1    Q. So, basically, what you would do is encrypt messages
2    and send encrypted messages across teletype, and they
3    taught you how to do that?
4    A. Yes, sir.
5    Q. And they taught you how to manage?
6    A. A communications stations.
7    Q. Communications station?
8    A. Yes.
9    Q. Were you stationed in the United States before you went
10   overseas to Germany?
11   A. No.
12   Q. Okay. When you graduated from your communications
13   specialist training in Fort Gordon, Georgia, where was
14   your next duty assignment?
15   A. My next duty assignment was Kaiserslautern, Germany. I
16   flew from, I believe it was New Jersey to Frankfurt,
17   Germany.
18   Q. And how long were you stationed in Germany?
19   A. About two years.
20   Q. And, after your tour in Germany was over, where were
21   you assigned?
22   A. I wasn't reassigned. My tour was over a total of three
23   years.
24   Q. While you were in the military, did you ever receive
25   discipline which amounted to a reduction in grade?

13

1    A. I believe I did.
2    Q. Can you tell me about that military discipline?
3    A. No, sir, I can't. I received a number of article
4    fifteens.
5    Q. What's an article fifteen?
6    A. It's a disciplinary action where you're superiors
7    discipline you, give you say a fine and then some extra
8    duty.
9    Q. You mentioned that you had a number of article
10   fifteens?
11   A. Yes, two.
12   Q. Two?
13   A. Yes.
14   Q. Okay. And those would have been while you were in
15   Germany?
16   A. No. One was in Fort Gordon, Georgia and the other was
17   in Kaiserslautern.
18   Q. What was the article fifteen that you received in Fort
19   Gordon, Georgia?
20   A. Fighting.
21   Q. Fighting?
22   A. Yes.
23   Q. Okay. Do you recall what your fine was?
24   A. I believe it was $75, but I'm not sure.
25   Q. What about the article fifteen in Germany?

14

1    A. I would say maybe any where from 75, 125 fine and a
2    week extra duty. It might have been two weeks extra
3    duty.
4    Q. What was the article fifteen for?
5    A. I don't recall.
6    Q. Was it for fighting?
7    A. I don't believe so.
8    Q. Did you receive an honorable discharge?
9    A. No, sir.
10   Q. What type of discharge from the military did you
11   receive?
12   A. Undesirable.
13   Q. Did you leave military service before your enlistment
14   period was completed?
15   A. Not that I know of.
16   Q. When you enlisted in 1973, how long was the period of
17   your enlistment?
18   A. Three years.
19   Q. Do you have a copy now of your discharge papers?
20   A. No, sir.
21   Q. You don't possess a copy of your discharge papers?
22   A. Not at home.
23   Q. Where are your discharge papers?
24   A. I have no idea.
25   Q. Have you ever seen your discharge papers?

15

1    A.   Yes.  I was given a copy of my discharge papers upon my

2         release.

3    Q.   What reasons are set out on your discharge papers?

4    A.   I don't remember.

5    Q.   For your undesirable?

6    A.   I don't recall.

7    Q.   Let's go back and talk about another rule that we need

8         to agree to; okay?  She'll take down everything I say

9         and she'll take down everything you say, but if we talk

10        over the top of each other she's not --

11   A.   I understand.

12   Q.   She's not good enough to take down both of us.  Either

13        I'll back off and you back off.  And we want a complete

14        record; is that agreeable?

15   A.   Yes, sir.

16   Q.   Okay.  Why were you given an undesirable discharge?

17   A.   Because I was accused of striking a noncommissioned

18        officer.

19   Q.   And did you strike a noncommissioned officer?

20   A.   In self defense.

21   Q.   Did that occur while you were stationed at Germany?

22   A.   Yes, sir.

23   Q.   Was that in any way related to the article fifteen that

24        you received in Germany?

25   A.   No, sir.

16

1    Q.   Were you court marshaled for striking this

2         noncommissioned officer?

3    A.   Yes, I was.

4    Q.   Okay.  What type of court marshall?

5    A.   I have no idea.

6    Q.   Where did the court's marshall occur?

7    A.   I have no idea.

8    Q.   Court's marshall is kind of a trial?

9    A.   Yes.

10   Q.   Okay.  Did you have a trial with a hearing?

11   A.   Yes, I did.

12   Q.   Do you recall where that occurred?  Did it occur in the

13        US or did it occur in Germany?

14   A.   It occurred in Germany.

15   Q.   Okay.

16   A.   That's why I don't remember where it was at.

17   Q.   And what was the result of the court's marshall?

18   A.   I was given a non-desirable discharge.

19   Q.   So you were found guilty of striking a noncommissioned

20        officer?

21   A.   Yes, I was.

22   Q.   Okay.  And, as a result of that court's marshall, you

23        were given a non-desirable discharge?

24   A.   Yes, sir.

25   Q.   Okay.  Do you have any of your military records in your

17

1         possession or can you access any of those military

2         records now?

3    A.   No, sir.

4    Q.   Okay.  If I prepare the appropriate release for those

5         military records and offer them to you for your

6         signature, will you sign a release so that I can secure

7         all of your military records?

8    A.   No, sir.

9    Q.   Well, besides the two article fifteens and the, is it a

10        general court's marshall?

11   A.   I believe it was, sir.

12   Q.   Okay.  Were this any other disciplinary and or criminal

13        like things that you were charged with while you were

14        in the military?

15   A.   No, sir.

16   Q.   And you don't recall what the article fifteen in

17        Germany was over?

18   A.   Pardon me?

19   Q.   You don't recall what the article fifteen in Germany,

20        that you received in Germany was about?

21   A.   No, sir.

22   Q.   Okay.  What were the circumstances involved with the

23        accusations of striking a noncommissioned officer?

24   A.   The noncommissioned officer walked up from behind me

25        and assaulted me, and I turned around and I hit him.

18

1    Q.   And you had a trial on this particular issue?

2    A.   And I claimed self-defense.

3    Q.   Did you testify at trial?

4    A.   Yes, I did.

5    Q.   Okay.  Did the person that you struck testify at trial?

6    A.   Yes, he did.

7    Q.   Okay.  Were you represented by counsel?

8    A.   I believe I was.

9    Q.   And there was a military prosecutor?

10   A.   Yes.  Well, I don't particularly remember the

11        prosecutor.

12   Q.   But there was somebody presenting the evidence against

13        you?

14   A.   I only remember the sergeant sitting on the other side

15        of the table.  That's all I remember.  I don't remember

16        if there was a prosecutor or not.

17   Q.   Sergeant would have been the individual that you

18        struck?

19   A.   Yes.

20   Q.   And there was an officer in charge of the general

21        court's marshall?

22   A.   Yes, sir.

23   Q.   And the officer was the one that listened to all of the

24        evidence that was presented against you?

25   A.   Yes, sir.

19

Q. And the officer was the one that determined that you were guilty of striking a noncommissioned officer?

A. Yes, sir.

Q. And the officer was the one that determined that, the officer that heard the court's marshall was the one that determined that you should get an undesirable discharge?

A. Yes, sir.

Q. Okay. Do you recall when in 19, or when that general court's marshall occurred?

A. No, sir.

Q. Was it in 1976?

A. I don't remember, sir.

Q. If you told me that you left the military in 1976, would it have been in 1976?

A. I have no idea.

Q. Okay. How soon after you were court's marshaled were you given the undesirable discharge?

A. I believe it was six months. I'm not sure. I believe it was six months.

Q. Besides the undesirable discharge, what were your other penalties?

A. Six months incarceration.

Q. Where were you incarcerated?

A. I believe it was Heidelberg, Germany.

20

Q. And that would have been in a military prison?

A. Yes, sir.

Q. Were there any fines or reductions in grade related to your general court's marshall?

A. I don't remember, sir.

Q. After you dropped out of Ottawa Hills High School when you were sixteen and before you joined the military in 1973, did you work?

A. Yes, I did.

Q. Okay. Where did you work?

A. I worked with my uncle, a carpenter and a mason.

Q. And your uncle's name is?

A. Elton Haywood. Deceased.

Q. Do you know the name of his business?

A. He was a private carpenter mason.

Q. Okay. Did you work with your uncle then until you joined the military?

A. Yes, sir.

Q. Okay. And after your discharge from the military, did you find work?

A. Yes, I did.

Q. Where did you work?

A. General Motors, Steelcase.

Q. How long did you work at General Motors?

A. I believe it was ten years.

21

Q. Do you recall what years those were?

A. No, sir.

Q. How soon after you were discharged in 1976 did you start working?

A. I believe it was about one year.

Q. Did you start working for General Motors first?

A. I believe it was.

Q. And why did you stop working at General Motors?

A. Because of a discriminative issue.

Q. Could you explain what you mean by discriminative issue?

A. Yes, I can. I was given a job to perform of which I was not given the tools to perform the job, and they released me because I didn't perform the job, and then I went to work for Steelcase. During the course of me finding another job and working at Steelcase, I filed a lawsuit against General Motors for the discriminative act of giving me a job without the tools to perform it and then firing me for not performing the job and not giving me the tools to do it with.

Q. Where was that lawsuit filed?

A. I went through the NAACP.

Q. Did the NAACP file the lawsuit for you?

A. Well, they resolved it, and I got the job back at General Motors. I don't know what they did. I don't

22

know if they filed a lawsuit. I don't know what they did. All I know is I called the NAACP, I give them a description of what happened, they took care of it. I went back to work for General Motors a year later.

Q. Okay. So you worked for General Motors all total ten years?

A. Yes.

Q. Okay. And during that period you were fired for not performing your job by General Motors, you filed a complaint with the NAACP and got your job back?

A. Yes.

Q. That was all within that ten year period?

A. Yes, sir.

Q. How long did you work for Steelcase?

A. One year.

Q. When did you stop working for General Motors?

A. When my father died. I believe it was either 1981 or 1982.

Q. Some of those numbers don't add up for me here, Mr. Williams. Let's see if we can work through it. After you were discharged from the service what you said in 1976?

A. Yes.

Q. You were off work for a year?

A. Yes.

DEPOSITION OF DONALD WILLIAMS
5-18-07

23

1  Q.  Which would make it 1977?

2  A.  Right.

   Q.  And then you worked for General Motors for ten years?

3

4  A.  I believe it was.

5  Q.  And then worked for Steelcase for a year?

6  A.  Yes.

7  Q.  Okay.  And you say now that you left General Motors in

8     1981 or 1982?

9  A.  I believe it was.  How many years is that?

10  Q.  By my calculation it was five years.

11  A.  Then it's five years.

12  Q.  You're not certain exactly how long you worked for

13     General Motors?

14  A.  I just give a rough estimate.

15  Q.  Well, you're under oath; okay?

16  A.  Well.

17  Q.  And if you don't know the answer to my question you

18     need to tell me you don't know the answer to my

19     question.  If you answer the question, we're going to

20     assume that you answered it correctly.

21  A.  Okay.

22  Q.  Okay.  You're certain about the fact that you stopped

23     working at General Motors in 1981 or 1982?

24  A.  That's what I think.

25  Q.  Okay.  And during that period after you got out of the

24

1     service until the time you ended up, ended working at

2     General Motors that would have included also the time

3     you spent working at Steelcase, that would have been in

4     in that entire period as well?

5  A.  Yes, I believe that's correct.

6  Q.  After you left General Motors, did you get another job?

7  A.  I worked at Diesel Technology.

8  Q.  Where is that?

9  A.  Burlingame, I believe it is, and 44th Street.

10  Q.  And how long did you work at Diesel Technology?

11  A.  Three years.

12  Q.  Is that an estimate?

13  A.  Yes.

14  Q.  Okay.  Why did you leave GM?

15  A.  My father died.  I couldn't cope with it.

16  Q.  Okay.  Were you asked to leave GM?  Were you fired or

17     forced out?

18  A.  No.  They was trying to force me out, but eventually I

19     just quit.

20  Q.  And how soon after you quit GM did you start working

21     for Diesel Technology?

22  A.  I have no idea.  I worked numerous jobs, Mother

23     Hubbard, I took numerous, I worked at what's the name

24     of that manufacturers?

25  Q.  What I'd like to be able to do is go through.

25

1  A.  You want a resumé?

2  Q.  I want to develop a crinology as to places where you

3     work.

4  A.  If you would have let me know I could have give you a

5     resumé of all that information.  I have it all written

6     down, but I worked in a number of different places

7     before I started working at Diesel Technology.

8  Q.  Okay.  Well, can we agree on the record today that

9     you'll provide me a resumé or a listing of places that

10     you've worked?

11  A.  No, sir.

12  Q.  Okay.  Well, then what I'm going to do is go through

13     all of the places that you worked.

14  A.  Okay.

15  Q.  So you think you worked at Diesel Technology for three

16     years?

17  A.  Yes, sir.  But that's not after I left General Motors.

18     After I left General Motors I worked at numerous

19     places, Mother Hubbard, something industries.  I forget

20     the name of this other manufacturer.  I worked at

21     numerous other places.  I even went to school to

22     Oklahoma Baptist University before I started working at

23     Diesel Technology.

24  Q.  So, as we sit here today, can you give me a time

25     crinology of the places you worked?

26

1  A.  A what?

2  Q.  As we sit here today, can we go through and can you

3     give me a listing or crinology of all of the places

4     that you worked?

5  A.  No, I can't.

6  Q.  Okay.  And you refuse to provide me voluntarily the

7     written document, which includes all the listings of

8     the places?

9  A.  That is correct.

10  Q.  Okay.  When did you leave work at Diesel Technology?

11  A.  It was the end of December 2001.  That was the last

12     time I worked.

13  Q.  You haven't worked since the end of December 2001?

14  A.  No, sir.

15  Q.  And I'd like to double back here a second.  You said

16     that you dropped out of high school when you were

17     sixteen?

18  A.  Yes, sir.

19  Q.  Did you ever get a GED?

20  A.  Yes, sir.

21  Q.  Okay.  When did you get your GED?

22  A.  I don't remember, sir.

23  Q.  Did you receive your GED while you were in the

24     military?

25  A.  No, sir.  I don't remember if it was before or after I

27

1          left the military.  Before I went in or after I, I
2     believe it was after I left the military that I
3     received my GED.
4  Q.  Would you have received your GED in town here?
5  A.  Yes, sir.
6  Q.  From the Grand Rapids Public Schools?
7  A.  I don't remember where it was at.
8  Q.  Do you remember where or if you took classes related to
9     the GED?
10 A.  No, sir.  I do not remember if I took classes or what I
11    did.  It's been over twenty years ago.
12 Q.  But you did receive your GED while you were living in
13    Grand Rapids?
14 A.  Yes, I did.
15 Q.  Okay.  Have you received any other education past your
16    GED?
17 A.  Yes, I have.
18 Q.  What did you take or have you received?
19 A.  I've got 32 credits at Oklahoma Baptist University, 31
20    or 32, somewhere in there.
21 Q.  And where is Oklahoma Baptist University?
22 A.  In Oklahoma City, well, in Oklahoma.
23 Q.  What city in Oklahoma?
24 A.  I don't know what city it is.
25 Q.  You were about to say Oklahoma City.  You don't think

28

1     it's in Oklahoma City?
2  A.  No, sir.
3  Q.  If I prepare a release for educational records today
4     for Oklahoma City or Oklahoma Baptist University, will
5     you sign that voluntarily?
6  A.  No, sir.
7  Q.  Okay.  Will you sign a release voluntarily for the
8     records, the employment records at GM?
9  A.  No, sir.
10 Q.  Will you sign a release voluntarily for the employment
11    records at Diesel Technology?
12 A.  No, sir.
13 Q.  Okay.
14          MR. OPHOFF:  Let's go off the record.
15          (Off the record at 9:40 AM)
16          (Back on the record at 9:40 AM)
17 BY MR. OPHOFF:
18 Q.  I just want to confirm that you're not going to
19    voluntarily provide me releases for your past employers
20    and you won't provide me a voluntary release for your
21    military records and you won't provide me voluntarily
22    releases for any of your educational records; is that
23    correct?
24 A.  That is correct.
25 Q.  Mr. Williams, other than the general court's marshall

29

1     for striking a noncommissioned officer, have you ever
2     been convicted of any other crime?
3  A.  Yes, I have.
4  Q.  And have you been convicted more than once?
5  A.  Yes, I have.
6  Q.  What I'd like to do, again, is establish a crinology or
7     a listing of these convections.  So I'm going to start
8     back before you dropped out of high school.  Were you
9     convicted of any crimes before you dropped out of high
10    school?
11 A.  No, sir.
12 Q.  Were you convicted of any crimes between the time you
13    dropped out of high school and you entered the
14    military?
15 A.  No, sir.
16 Q.  Okay.  Other than the general court's marshall you told
17    me about, were you convicted of any other crimes while
18    you were in the military?
19 A.  No, sir.
20 Q.  After you received your dishonorable or undesirable
21    discharge from the military, when was the first time
22    that you were convicted of a crime after that date,
23    which would have been 1976?
24 A.  I have no idea.
25 Q.  Tell me, if you can from your memory, what you can

30

1     remember about the crimes you were convicted of?
2  A.  Assault and battery, other than that, generally
3     speeding tickets.
4  Q.  Were did the assault and battery occur?
5  A.  I have no idea.
6  Q.  Was that in the city of Grand Rapids?
7  A.  I believe so.
8  Q.  Were you charged by the Grand Rapids Police Department?
9  A.  I believe so.
10 Q.  Do you remember what year that was?
11 A.  No, sir.
12 Q.  Would it have been in the last five years?
13 A.  I have no idea.
14 Q.  You have no idea?
15 A.  No, sir.
16 Q.  Okay.  How many speeding tickets were you convicted of?
17 A.  I have no idea.
18 Q.  Do you have a driver's license right now?
19 A.  No, sir.
20 Q.  Has your driver's license been revoked or suspended by
21    the Michigan Secretary of State's office?
22 A.  I believe so for nonpayment of traffic fines.
23 Q.  Do you know when your driver's license was suspended?
24 A.  No, sir.
25 Q.  Will you voluntarily sign a release so that I can

31

1       secure Secretary of State's records relating to your

2       driving record?

3   A.   No, sir.

4   Q.   Besides the assault and battery charge and the speeding

5       tickets, were you convicted of any other crimes after

6       1976 continuing to the date of this deposition?

7   A.   Not that I know of, sir.

8   Q.   And your testimony today is that the assault and

9       battery occurred in the city of Grand Rapids?

10   A.   Yes, sir.

11   Q.   The speeding tickets occurred in the city of Grand

12       Rapids as well?

13   A.   Yes, sir.

14   Q.   Have you ever been charged with a crime and not been

15       convicted of that crime?

16   A.   Not to my recollection.

17   Q.   Did you have a trial with the assault and battery

18       charge?

19   A.   I don't even remember. All I remember is that I've

20       been convicted of assault and battery.

21   Q.   Do you remember whether or not you pled guilty to the

22       charge?

23   A.   I have no idea.

24   Q.   How about the speeding tickets, did you have trial for

25       those.

32

1   A.   I couldn't recall that information and give you an

2       honest answer right now, because it's been so long ago.

3   Q.   That's what I want. Okay. If you don't remember just

4       let me know. Did you have any involvement with the

5       juvenile court before you became an adult?

6   A.   No, sir.

7   Q.   Do you have any brothers or sisters?

8   A.   No, I don't.

9   Q.   You mentioned that your father died in 1981 or 1982?

10   A.   Yes, sir.

11   Q.   Is your mother still living?

12   A.   Yes, sir.

13   Q.   Is she living in the Grand Rapids area?

14   A.   Yes, sir.

15   Q.   What is her name?

16   A.   Eleanor Williams.

17   Q.   Is she living with you?

18   A.   No, sir.

19   Q.   And where does she live?

20   A.   She lives at 119 Alton Street.

21   Q.   E-l-t-o-n?

22   A.   A-l-t-o-n.

23   Q.   Is that in Grand Rapids?

24   A.   Yes, it is.

25   Q.   And you don't have any brothers or sisters?

33

1   A.   That's what I said.

2   Q.   Do you live alone?

3   A.   Yes, I do.

4   Q.   Mr. Williams, have you ever been married?

5   A.   Yes, I have.

6   Q.   When were you married?

7   A.   I don't have any idea of when that was.

8   Q.   Before or after you went into the military.

9   A.   After.

10   Q.   Who were you married to?

11   A.   I was married to Jacqueline Carter.

12   Q.   How long were you married to Jacqueline Carter?

13   A.   I don't remember.

14   Q.   Is there any other individuals that you were married

15       to?

16   A.   I was married to Linda Dean.

17   Q.   Any other individuals that you were married to?

18   A.   No, sir.

19   Q.   Do you have any children from either of those

20       marriages?

21   A.   Yes, sir.

22   Q.   With Jacqueline Carter, who are your children?

23   A.   Monique Williams.

24   Q.   Any others?

25   A.   Not with her.

34

1   Q.   How old is Monique?

2   A.   I have no idea.

3   Q.   With Linda Dean, how many children did you have?

4   A.   Three.

5   Q.   And what are their names?

6   A.   Donald Verness Williams III, LaToya.

7   Q.   LaToya Williams?

8   A.   Dean.

9   Q.   Okay.

10   A.   And Terah.

11   Q.   Can you spell that for us?

12   A.   T-e-r-a-h Williams.

13   Q.   So how old is Donald V. Williams III?

14   A.   He was born in 1983. LaToya was born in 1984. I don't

15       remember when Terah was born.

16   Q.   Is Terah the youngest?

17   A.   Terah is the youngest. I don't remember when Monique

18       was born.

19   Q.   Were you and Jacqueline married in the Grand Rapids

20       area?

21   A.   I don't remember where we got married.

22   Q.   Were you married to Linda Dean in Grand Rapids?

23   A.   Yes, sir.

24   Q.   Did you get a divorce from Jacqueline Carter?

25   A.   Yes, I did.

35

1  Q.  Was that divorce in Kent County Circuit Court?

   A.  I believe it was in South Haven.

   Q.  And do you remember when that divorce was finalized?

4  A.  No, sir.

5  Q.  And did you get a divorce from Linda Dean?

6  A.  Yes, I did.

7  Q.  Would that have been in Kent County Circuit Court?

8  A.  I don't remember.

9  Q.  Do you pay child support for Monique Williams?

10 A.  Yes, I do.

11 Q.  Is there currently a child support order entered with

12     the circuit court that requires your child support

13     payments?

14 A.  It's the time has elapsed for, she's over age now. All

15     I'm paying is back child support for all of them,

16     because I had the, Linda Dean she had that stopped, so

17     I don't pay support for, only back child support is all

18     that I pay. That's all I pay, back child support.

19 Q.  So are all of your children then over 18?

20 A.  I believe so.

21 Q.  Okay. Do you know where Monique lives now?

22 A.  No, sir.

23 Q.  Do you know where Jacqueline Carter lives?

24 A.  I believe it's in Holland, but I'm not sure.

25 Q.  Do you know where Linda Dean lives?

36

1  A.  Somewhere here in Grand Rapids.

2  Q.  Do you know where Donald V. Williams III lives?

3  A.  I don't know where he's at.

4  Q.  How about LaToya?

5  A.  I don't know where he's at.

6  Q.  How about Terah?

7  A.  I don't know where she's at.

8  Q.  How much is your child support payment that you're

9      making?

10 A.  I don't know.

11 Q.  Do you have any source of income at all right now?

12 A.  No, sir.

13 Q.  Are you on any form of government assistance?

14 A.  I'm on, I believe, a section eight where they take care

15     of my housing.

16 Q.  Are all your government or all your housing costs paid?

17 A.  There's only rent.

18 Q.  So are all of your rent cost is paid through section

19     eight housing?

20 A.  Yes.

21 Q.  Do you receive any form of government assistance?

22 A.  I believe food stamps.

23 Q.  Do you receive any other form of government assistance?

24 A.  No, sir.

25 Q.  Do you receive medical coverage through medicaid?

37

1  A.  No, sir, nothing else.

2  Q.  Do you have any savings or retirement benefits from

3      either General Motors or Steelcase or Diesel

4      Technology?

5  A.  No, sir, I have absolutely nothing.

6  Q.  So your only source of income is the section eight

7      housing and food stamps?

8  A.  That is correct.

9  Q.  And you're not currently employed?

10 A.  That's what I said.

11 Q.  Okay. Do you have any physical disability that keeps

12     you from being employed?

13 A.  No, sir.

14 Q.  Do you have any mental disability that you know of that

15     keeps you from being employed?

16 A.  No, sir.

17 Q.  Mr. Williams, do you have a library card?

18 A.  Yes, I do.

19 Q.  How long have you had a library card?

20 A.  I have no idea how long I've had it.

21 Q.  Well, have you received a library card in the last

22     year?

23 A.  I've had it for more than a year.

24 Q.  Did you have a library card in 2005?

25 A.  I have no idea when I obtained it, but I've had it more

38

1      than a year.

2  Q.  Okay. Well, the events that are set out in your

3      complaint occurred in 2005. Did you have a library

4      card when you came to the library in 2005?

5  A.  Yes, I did.

6  Q.  Okay. Are you what would be called a regular user of

7      the library facilities in Grand Rapids?

8  A.  I used to be until I filed this complaint, of which I

9      have not entered the library since.

10 Q.  So what your testimony is that before this event you

11     went to the library regularly?

12 A.  Yes, I did.

13 Q.  Okay. And your testimony today is after this event you

14     haven't been back to the library?

15 A.  That is correct.

16 Q.  Okay. Well, about a year after this event you filed a

17     suggestion form with the library?

18 A.  Yes, I did.

19 Q.  Do you recall that?

20 A.  Yes, I did.

21 Q.  Did you go to the library when you filed your

22     suggestion form?

23 A.  Yes, I did.

24 Q.  So, at least with regards to the suggestion form, you

25     went back to the library with that particular event?

39

1   A.  What are you saying that I went back before I filed
2       this?
3   Q.  No.  Your testimony, as I understood it, correct me if
4       I'm wrong here, is that after the events that occurred
5       in September of 2005 you never went back to the
6       library?
7   A.  No.  I did go back to the library.  I didn't go back to
8       the library after I filed this litigation.
9   Q.  Okay.  Which would have been in 2006?
10  A.  Exactly.
11  Q.  Okay.  That's good for clarification.  Okay.  So after
12      you filed the lawsuit, let me see if I can get a
13      precise date here, looks like it's in September of
14      2006.  Is that about correct; do you think?
15  A.  Yes, sir.
16  Q.  You haven't been back to the library after that date?
17  A.  No, sir.
18  Q.  If the events that are set out in your complaint
19      occurred in September of 2005 your testimony today is
20      that between 2005 and 2006 you continued to go back to
21      the library?
22  A.  Pardon me?
23  Q.  Is your testimony today that between September of 2005
24      and the date that you filed this lawsuit, September of
25      2006, it's your testimony that you went back to the

40

1       library during that period?
2   A.  Yes, sir.  I went back to the library after the event
3       occurred, but when I filed the lawsuit I ceased to
4       return.
5   Q.  Okay.  And is it your testimony today that you were a
6       fairly regular user of the library before September of
7       2005?
8   A.  Yes, I was.
9   Q.  Would you have gone to the library on a daily basis?
10  A.  No.  A weekly basis.  Maybe once or twice a week.
11  Q.  And after September 2005 and before you filed the
12      lawsuit you continued to go to the library?
13  A.  Yes, sir, that's what I said.
14  Q.  Okay.  And you continued to go there about once or
15      twice a week?
16  A.  Yes, sir.
17  Q.  Okay.  And then, in September of 2006 you filed your
18      suggestion with the library and also filed your
19      lawsuit?
20  A.  Yes, sir.
21  Q.  Now, you represented yourself in this lawsuit; is that
22      correct?
23  A.  Yes, I did.
24  Q.  Did you draft the complaint which you filed in this
25      lawsuit yourself?

41

1   A.  I drafted every document that's been presented in this
2       litigation.
3   Q.  Did you have any assistance in drafting the documents
4       that have been presented in this litigation?
5   A.  No, sir.
6   Q.  Okay.  Now, you filed other lawsuits; correct?
7   A.  Yes, I have.
8   Q.  In fact, you have sued the Grand Rapids Housing
9       Commission on one occasion?
10  A.  I tried to.
11  Q.  Back in 2004?
12  A.  I tried to.
13  Q.  Okay.  And you sued the 36th Judicial District Court?
14  A.  What, I tried to.  I tried to sue numerous places.
15  Q.  That would have been in 2003.  And then, there's a
16      lawsuit that's on record Williams versus Wood from
17      2002; do you remember that one?
18  A.  That was the employment agency, I believe.
19  Q.  And it looks like there was another lawsuit against the
20      36th District Court in 2002?
21  A.  I don't remember.  I filed numerous.
22  Q.  It looks like you filed a lawsuit against Michigan
23      Works in 2002?
24  A.  Yes, I did.
25  Q.  And it looks like you also filed a lawsuit against

42

1       Ameritech in 2002?
2   A.  I don't remember.
3   Q.  You don't remember the Ameritech lawsuit?
4   A.  Oh, yes, I did.
5   Q.  Okay.  In all of those lawsuits, were you representing
6       yourself?
7   A.  Yes, I was.
8   Q.  And, in all of those lawsuits, did you draft all of the
9       pleadings that were filed on your own?
10  A.  Everything.
11  Q.  Okay.  Did you receive any assistance in drafting any
12      of the pleadings --
13  A.  None.
14  Q.  I'm not finished with my question.  In any of the
15      lawsuits that I just talked about?
16  A.  No, sir.
17  Q.  Now, these are federal district lawsuits that I just
18      described to you?
19  A.  I believe so.
20  Q.  Have you ever filed summons and complaint and a lawsuit
21      in the state court system?
22  A.  No, sir.
23  Q.  Okay.  Your lawsuit against the Housing Commission,
24      what was the nature of the complaint that you filed
25      against the Grand Rapids Housing Commission?

43

1    A.  The nature was is that they were issuing section eights
2        to women and disabled people before single men.
3    Q.  So when you filed the lawsuit, did you have section
4        eight housing?
5    A.  Well, I don't know.  They -- I don't know the
6        difference between what I've got now and what they're
7        saying that I can receive.  I don't know what the
8        difference is.  They're calling this a section eight,
9        they're calling that a section eight.  I don't know why
10       they are differentiating.  I can't tell the difference.
11   Q.  So you don't know whether or not you had section eight
12       housing when you filed the lawsuit against the Grand
13       Rapids Housing Commission?
14   A.  I'm not sure.
15   Q.  Okay.  What happened to that lawsuit?
16   A.  I lost.
17   Q.  Okay.
18   A.  I haven't won any lawsuits.
19   Q.  You have two lawsuits against the 36th Judicial
20       District Court.  That's a state court; right?
21   A.  I believe so.
22   Q.  Is that South Haven?
23   A.  I don't know where it was at.  I don't remember.
24   Q.  The record indicates that one of your lawsuits against
25       the 36th District Court was filed in 2002 and one of

44

1        them was filed in 2003.  Let's talk about the one that
2        was filed in 2003.  That's the most recent?
3    A.  I don't remember any of them.  I don't remember
4        anything about them.
5    Q.  Do you remember what you filed the lawsuit in 2003
6        against the 36th Judicial District Court over?  Why did
7        you sue them?
8    A.  I have no idea.  I don't remember.
9    Q.  You don't remember why you sued --
10   A.  I don't remember what it was about.  I remember that I
11       did, but I don't remember what the nature of the suit
12       was about.
13   Q.  And would that be the case for both of the 36th
14       Judicial District Court cases?
15   A.  That would be the case for all of those cases except
16       for Oklahoma City Housing Authority.  I remember what
17       that case was about.
18   Q.  Okay.  So Williams versus 36th Judicial District Court,
19       did you lose that case?
20   A.  I lost all of them.
21   Q.  You lost all your cases?
22   A.  I haven't won a single case.
23   Q.  Do you remember what the lawsuit Williams versus Wood
24       was about?
25   A.  No, sir.

45

1    Q.  Okay.  Do you remember what Williams versus Michigan
2        Works was about?
3    A.  No, sir.
4    Q.  How about Williams versus Ameritech?
5    A.  They accused me of having a telephone in Detroit
6        Michigan, and they would not allow me telephone
7        service.  I've never lived in Detroit, Michigan.  The
8        bill is not mine, and I tried -- I sent them my history
9        with bill receipts to dismiss that off my account, and
10       they would not dismiss it, so I tried to sue them.
11       I've still got that bill on my record.  It's not mine.
12   Q.  That was back in 2002?
13   A.  I don't remember what date it was and when, but the
14       issue was is that they have my account charged with
15       some other Donald Williams that lives in Detroit.
16       That's what that issue was about.
17   Q.  You mentioned that you filed a lawsuit against the
18       Oklahoma City?
19   A.  Housing Authority.
20   Q.  Housing Authority?
21   A.  Yes, sir.
22   Q.  When did you live in Oklahoma City?
23   A.  I believe it was 9, '89 to '90, somewhere between 1989
24       and 1994.
25   Q.  Would you have lived in Oklahoma City while you were

46

1        attending the?
2    A.  Yes.
3    Q.  Let me go back and mention it here.
4    A.  Oklahoma Baptist university.
5    Q.  Oklahoma Baptist university.  So you lived in Oklahoma
6        City while you were attending Oklahoma Baptist
7        University?
8    A.  Yes, sir.
9    Q.  Were you married when you attended Oklahoma Baptist
10       University?
11   A.  No, sir.
12   Q.  Okay.  And, at some point, you filed a lawsuit against
13       the Oklahoma City Housing Authority?
14   A.  Yes, sir.
15   Q.  And that would have been sometime between 1989 and
16       1994?
17   A.  Yes.
18   Q.  Okay.  And what was the nature of that lawsuit?
19   A.  They entered my apartment without a warrant.  They
20       assaulted me.  There were numerous other charges.
21   Q.  That you made against the Housing Authority?
22   A.  Yes, sir.
23   Q.  Were you ever charged with a crime based on this
24       incident?
25   A.  No, sir.

47

1    Q.  Okay.  Did you ever find out why the Oklahoma City
2        Housing Authority entered your apartment?
3    A.  Yes.
4    Q.  And what did they say they entered the apartment for?
5    A.  An emergency.
6    Q.  What kind of an emergency?
7    A.  That a motorcycle was in an apartment and that that
8        created an emergency for them to enter.
9    Q.  A motorcycle was in your apartment?
10   A.  Right.
11   Q.  Okay.  Was there a motorcycle in your apartment?
12   A.  Yes, sir.
13   Q.  Was the motorcycle running?
14   A.  No, sir.
15   Q.  Okay.  And you claim that you were assaulted based on
16       this event?
17   A.  Yes, sir.
18   Q.  Okay.  And you filed a lawsuit in Oklahoma City?
19   A.  Yes, I did.
20   Q.  Related to this event?
21   A.  Yes, sir.
22   Q.  Was that an in pro per lawsuit?
23   A.  Yes, sir.
24   Q.  Okay.  And did you draft all the pleadings for this on
25       your own?

48

1    A.  Yes, I did.
2    Q.  Okay.  And do you remember what the claims were in that
3        lawsuit?
4    A.  Illegal entry, assault and battery, slander.
5    Q.  Were you claiming constitutional violations?
6    A.  Yes.
7    Q.  Which constitutional violations were you claiming?
8    A.  Numerous.  I don't remember specifically, but, most
9        importantly, the fourteenth.
10   Q.  Fourteenth amendment violations?
11   A.  Yes, yes.
12   Q.  Was this a lawsuit based on 42 USC section 1983?
13   A.  Yes, sir.
14   Q.  Would it be fair to say that all of your lawsuits are
15       based on 42 USC section 1983?
16   A.  You could say that.
17   Q.  Okay.  Have you ever had any formal training relating
18       to drafting pleadings or filing lawsuits?
19   A.  No, sir.
20   Q.  Where did you learn how to do this?
21   A.  I taught myself.  I'm not very good at it, though.
22   Q.  Have you ever been sanctioned because of the lawsuits
23       that you filed in the federal district court system?
24   A.  No, sir.
25   Q.  Do you have any other lawsuits going right now?

49

1    A.  No, sir.
2    Q.  So the only lawsuit that you have right now is the one
3        that we're here in?
4    A.  Yes, sir.
5        (Deposition Exhibit 1 marked at 10:12 AM)
6    BY MR. OPHOFF:
7    Q.  Okay.  Mr. Williams, I'm going to show you what I
8        believe is a schematic drawing of the Grand Rapids
9        Public Library, Ryerson Library.  You're familiar with
10       the Ryerson Library?
11   A.  Yes, I am.
12   Q.  Looking at the schematic, can you make out or determine
13       or see that it is the schematic of the Grand Rapids
14       Public Library?
15   A.  Yes, it is.
16   Q.  Okay.  And there's a portion that's sort of in dark
17       bolded outline?
18   A.  Yes, sir.
19   Q.  Okay.  That appears to me to be the old Ryerson
20       building; is that correct?
21   A.  It looks that way.
22   Q.  Okay.  And, as you proceed with the drawing, it would
23       be to your right in the drawing there's a section of
24       this exhibit that looks like, perhaps, the new portion
25       of the library; is that correct?

50

1    A.  Yes, it does.
2    Q.  Okay.  This is a document that has been given me by
3        people at the library suggesting that this is the way
4        that the library looked or, perhaps, was set out in
5        September of 2005 when the incidents related to your
6        lawsuit occurred.  Can you tell me whether or not
7        that's accurate?
8    A.  I don't know.  I can see the locations, but the angles
9        look different.  For example, this room is familiar,
10       but there are other things missing here.
11   Q.  Okay.  Well, let's go through it.  In September of
12       2005, did you enter the Ryerson Library?
13   A.  Yes, I did.
14   Q.  Through the main entrance?
15   A.  Yes, I did.
16   Q.  Okay.  And that's shown on this exhibit; correct?
17   A.  Yes, it is.
18   Q.  Okay.  And it's also clear from this exhibit that
19       there's an information desk?
20   A.  Yes, sir.
21   Q.  Okay.  And that's, as you come into the library it
22       would be to your right as you come into the library?
23   A.  Yes, sir.
24   Q.  Okay.  In the old Ryerson section?
25   A.  Yes, sir.

51

1    Q.   Okay.  And then there's a circulation desk across the

2         lobby?

3    A.   Yes, sir.

4    Q.   Okay.  And that's where you check out books; correct?

5    A.   Yes, that is correct.

6    Q.   Okay.  And when you checked out books at the library

7         that's where you checkbooks out?

8    A.   Yes, sir.

9    Q.   Okay.  And with your library card you have checked out

10        books at the library before?

11   A.   Yes, I have.

12   Q.   Okay.  Have you checked out videos?

13   A.   I've checked out DVD's.  I don't have a VCR.

14   Q.   You play the DVD's on your computer?

15   A.   Yes, I do.

16   Q.   Okay.  And so, as you went into the library in

17        September of 2005, as I understand your complaint, you

18        went into the reference section of the library; is that

19        correct?

20   A.   That is correct.

21   Q.   And that would require you to proceed through the

22        hallway in the Ryerson and go down a set of steps;

23        correct?

24   A.   That is correct.

25   Q.   Are those steps something you can see on this exhibit?

52

1    A.   No, sir.

2    Q.   This is bad.

3    A.   Okay.  I see them now.

4    Q.   Let's mark them as steps; okay?

5    A.   Yes, sir.

6    Q.   Can you identify those as the steps that would lead

7         down to the reference section?

8    A.   Yes, sir.

9    Q.   Okay.  Why don't you put your initials in the box

10        underneath my identification for the step; okay?  Okay.

11        And as you come down the steps into the reference

12        section of the library it looks like there's another

13        desk almost immediately as you proceed down the steps;

14        correct?

15   A.   Excuse me for interrupting, but I need to use the

16        restroom.

17   Q.   That's a legitimate request, and we'll go off the

18        record.

19             (Off the record at 10:17 AM)

20             (Back on the record at 10:23 AM)

21        MR. OPHOFF:  Let's go back on the record.

22   BY MR. OPHOFF:

23   Q.   We were looking at what's been marked as Deposition

24        Exhibit 1, which we've agreed is the schematic or

25        layout of what appears to be the first floor of the

53

1         Ryerson Library and the reference portion of the

2         library, is that correct, Mr. Williams?

3    A.   That is correct.

4    Q.   Okay.  And you have identified the stairs that lead

5         down to the reference section as they, as someone comes

6         out of the Ryerson Library; correct?

7    A.   That is correct.

8    Q.   And I think we were at the point of identifying what

9         appears to be a half-moon desk in the reference section

10        as you come down the stairs; can you see that?

11   A.   Yes, sir.

12   Q.   Okay.  I'll circle that and mark it desk, and if you

13        could put your initials on that that would be great.

14        So that desk location is an accurate reflection of what

15        you recall about the reference section of the library?

16   A.   That is correct.

17   Q.   Okay.  Now, that day in September of 2005 that we are

18        talking about here today, you came in contact with a

19        person by the name of Tim that was working in the

20        reference section in the morning and early afternoon

21        hours; correct?

22   A.   That is correct.

23   Q.   Was Tim behind or near the reference desk that we've

24        just identified when you came into the library?

25   A.   Well, I didn't notice whether Tim was at the reference

54

1         desk when I came into the library, but at about I'll

2         say 2:00, 2:05 I heard him and another guy talking at

3         the reference desk.  Both of them were sitting at the

4         desk at 2:00 o'clock or 2:05.

5    Q.   Okay.  And that would be the desk that we've just

6         identified; is that correct?

7    A.   That is correct.

8    Q.   When you came into the library, did you locate a place

9         to sit?

10   A.   Yes, I did.

11   Q.   And looking at this schematic today, can you identify

12        the desk or do you see the desk that you were sitting

13        at that day?

14   A.   Yes, I do.

15   Q.   Okay.  And could you point that out to me?

16   A.   That's this one right here.

17   Q.   Okay.  We just got some colored markers here, and what

18        I'll do if go over and mark again the stairs in red,

19        circle around the stairs in red; correct?

20   A.   That is correct.

21   Q.   Okay.  And circle around the desk in red; okay?

22   A.   That's correct.

23   Q.   Now, you said the table that you were sitting at was

24        right here?

25   A.   That's correct.

55

1   Q.   Let's circle that in blue. We'll mark that table. If
2        you can put your initials underneath that. When you
3        went into the library on that day, did you go directly
4        to that table and set up what you were going to do?
5   A.   Yes, I was.
6   Q.   Okay. And, as I understand your complaint, you came
7        into the library and set up your computer; correct?
8   A.   That is correct.
9   Q.   Did you plug your computer into a power source?
10  A.   Yes, I did.
11  Q.   Where was the power source?
12  A.   At the table.
13  Q.   Below the table?
14  A.   No right on top of the table.
15  Q.   Okay. Is there a wall or was there a wall near the
16       table?
17  A.   There is a wall behind the table.
18  Q.   Okay.
19  A.   This wall here. One table behind me there's a wall
20       right here.
21  Q.   Okay. And which direction were you facing as you sat
22       up?
23  A.   I was facing, what would that be, that would be north.
24  Q.   So you would be facing the?
25  A.   This way.

56

1   Q.   The main portion of the reference library?
2   A.   Yes.
3   Q.   Okay. I'll just put an arrow there.
4   A.   That's correct.
5   Q.   Is that the direction you were facing?
6   A.   Yes, sir.
7   Q.   Okay. And let's put that arrow in blue; okay?
8   A.   Yes, sir.
9   Q.   So you would have had your back to the wall that you
10       identified; correct?
11  A.   That is correct.
12  Q.   Okay. Was there anybody else sitting in your vicinity
13       that you can recall?
14  A.   Yes, sir.
15  Q.   Okay.
16  A.   There was a black man sitting at the table behind me,
17       and there was a Caucasian or white woman sitting across
18       over here, and then there was Tim's fellow employee
19       sitting on the other side over here.
20  Q.   Okay.
21  A.   And during the conversation a person walked down the
22       aisle.
23  Q.   So, as I understand your testimony, there was a man
24       sitting behind you?
25  A.   Yes.

57

1   Q.   And let's draw a red circle. Would that be where he
2        was sitting?
3   A.   Yes.
4   Q.   Okay.
5   A.   But see, I was sitting in this table here. I was
6        sitting in this chair.
7   Q.   That's the one that's been identified in blue?
8   A.   Well, no. You identified this one in blue.
9   Q.   So I identified the wrong table?
10  A.   You identified the correct table, but the wrong chair.
11       The black man was sitting in the chair. I was sitting
12       directly in front of him at that table in the next
13       chair. Can you see those? There are four tables at
14       the round circle, I mean, four chairs at the round
15       circle table.
16  Q.   You were sitting at the first table and he was sitting
17       at the second table?
18  A.   I was sitting at this chair and he was sitting at that
19       chair.
20  Q.   So the circle should be expanded to include the chair?
21  A.   Right. But see, you marked the wrong one again. I was
22       sitting in that one. I was sitting at that chair on
23       that table.
24  Q.   So that would have been to the far left chair?
25  A.   That's the correct chair.

58

1   Q.   Okay.
2   A.   And he was sitting back here at this chair. A black
3        man.
4   Q.   You were sitting at the first table he was sitting at
5        the second table?
6   A.   Right.
7   Q.   And the Caucasian woman was sitting where?
8   A.   Over here on this side, but I was at this station here
9        facing me. Facing this way. Facing south.
10  Q.   Okay. So we have a patron here. Let's just mark that
11       P.
12  A.   Okay.
13  Q.   We'll put a box there for your initial. And we have a
14       patron here, and we'll put a box there for your
15       initial; correct?
16  A.   That's correct.
17  Q.   Okay. Did you ever talk to the African American
18       gentleman that was sitting at the table next to yours
19       on the date that we're talking about here?
20  A.   No, sir, I did not speak to anyone.
21  Q.   Okay. So you did not talk to or speak to the Caucasian
22       woman either?
23  A.   No, sir.
24  Q.   Okay. Today as we sit here, do you know their names?
25  A.   No, sir.

DEPOSITION OF DONALD WILLIAMS
5-18-07

59

1  Q.  Have you ever seen them at the library again?

2  A.  No, sir.

3  Q.  Okay.  So if we wanted to talk to them about what

4      happened that day, we would, from your information, we

5      wouldn't be able to locate them; correct?

6  A.  That is correct.

7  Q.  Okay.  And you said at some point while you were there

8      you noticed that Tim was, the library person, Tim was

9      behind this desk that we've identified?

10 A.  Yes.  He was talking with a fellow worker here.

11 Q.  Okay.

12 A.  Tim was in the closest chair to me, and a fellow worker

13     was in the next chair.

14 Q.  Okay.

15 A.  They were having a conversation.

16 Q.  So let's just mark those two chairs, and that's where

17     the library people would have been; right?

18 A.  Yes, sir.

19 Q.  Okay.  Let's just put a box there.  We are running out

20     of space.  Is it your testimony today that Tim and this

21     other library person were talking in a normal

22     conversational tone when you heard them?

23 A.  Yes, sir.

24 Q.  Okay.  Is there any way that you can estimate the

25     distance between those two chairs and where you were

60

1      sitting on that day?

2  A.  I have no idea, but I could take a guess.

3  Q.  Why don't you take a guess?

4  A.  I'd say about twenty feet.

5  Q.  Okay.  And when you came into the library, and what

6      time did you come into the library; do you remember?

7  A.  About 11:00 o'clock.

8  Q.  Okay.  And when you came into the library, did you come

9      into the library to read a book?

10 A.  I came in to do some research.

11 Q.  Okay.  Internet research?

12 A.  No, sir.

13 Q.  What type of research?

14 A.  Legal research.

15 Q.  Okay.  Using your computer or using books?

16 A.  Books, of which I would type information into the

17     computer.

18 Q.  Okay.  Do you recall what books you were using for

19     research that day?

20 A.  No, sir.

21 Q.  Okay.  Were you in the process of drafting pleadings?

22 A.  I don't remember what I was doing, but I was copying

23     some sections like 42 USC section 1983 or Michigan

24     Compiled Laws.  I was writing some statutes down.  I

25     was doing statutory research.

61

1  Q.  Was this in reference to a case that you had going on

2      at the time?

3  A.  I don't believe so.

4  Q.  Was this in reference to a case that you were thinking

5      about filing?

6  A.  No, sir.  It was just reference information that I was

7      gathering.

8  Q.  Were you copying those books or were you typing from

9      the books?

10 A.  I was typing from the books into the computer.

11 Q.  Okay.  Were you doing anything beside the legal

12     research when you were there in the library on

13     September 2005?

14 A.  No, sir.

15 Q.  Okay.  And is it your testimony today that you were

16     able to overhear something that Tim said?

17 A.  Yes, sir.

18 Q.  While he was sitting behind the circulation desk?

19 A.  Yes, I did.

20 Q.  And in your complaint, your amended complaint you quote

21     Tim as saying, "I'll bet I can catch him"?

22 A.  That is correct.

23 Q.  Okay.  That is something you heard Tim say?

24 A.  I heard Tim say that.  I overheard the two of them.

25 Q.  Your job is to listen to my questions and answer my

62

1      questions; okay?

2  A.  All right.

3  Q.  So your testimony today is that sitting at this desk

4      doing the research you overheard Tim say to the

5      individual that was sitting next to him I bet I can

6      catch him?

7  A.  Yes, sir.

8  Q.  That's a direct quote?

9  A.  That's a direct quote.

10 Q.  Okay.  Do you recall anything else he might have had

11     said?

12 A.  I overheard them talking.

13 Q.  Do you recall what they were saying?

14 A.  But I don't remember what they said, but I do remember.

15 Q.  So the only thing you remember was --

16 A.  He did say I bet I can catch him, because he said it in

17     a loud voice.

18 Q.  He said it in a loud voice?

19 A.  He said it in a loud voice.

20 Q.  Well, could you describe the individual that was

21     sitting next to him for me; male or female?

22 A.  Male.  A white male, an older white male.

23 Q.  He was sitting behind the desk?

24 A.  He was sitting next to Tim.

25 Q.  And this would have been about 2:00 o'clock in the

63

1    afternoon?

2    A.  Yes, sir.

3    Q.  So you didn't hear all the conversation, but you heard

4        Tim say I'll bet I can catch him, and you overheard

5        that because he spoke it in a louder voice?

6    A.  Exactly.

7    Q.  Now, that's in your amended complaint; correct?

8    A.  That's correct.

9    Q.  When you filed your initial complaint in this matter,

10       your first complaint in this matter, you didn't make

11       any reference to the fact that you heard Tim say I'll

12       bet I can catch him; right?

13   A.  That's correct.

14   Q.  It's only your amended complaint that you put that out?

15   A.  That's correct.

16   Q.  Is there a reason why you didn't put it in your initial

17       complaint and you decided to put it in your second or

18       your amended complaint?

19   A.  I wanted to get the litigation started, and I knew that

20       I was allowed to amend my pleading.

21   Q.  Well, it's almost like it's an afterthought, Mr.

22       Williams.  Are you sure you heard Tim say that?

23   A.  I've already testified that I did.

24   Q.  But you decided not to put it in the first complaint;

25       correct?

64

1    A.  I wanted to get the litigation started, and I knew I

2        was allowed to amend.

3    Q.  Which brings me to another one of my questions.  This

4        event occurred in September of 2005, you filed your

5        lawsuit in September of 2006.  When did you start

6        drafting the pleadings for this particular lawsuit?

7    A.  After the incident I went home and I wrote everything

8        down, which was my original complaint.  But I was.

9    Q.  Stop right there.  Your original complaint?

10   A.  Right.

11   Q.  So your original complaint is what you wrote almost

12       immediately after the incident?

13   A.  Exactly.

14   Q.  So that would not have included the phrase from Tim

15       I'll bet I can catch him?

16   A.  Well, I wrote that down because it happened.

17   Q.  Well, your original complaint, you testified, is what

18       you wrote down exactly after the incident occurred;

19       correct?

20   A.  Exactly.

21   Q.  When did you write the suggestion form?

22   A.  What's the date on the suggestion form?

23       (Deposition Exhibit 2 marked at 10:41 AM)

24   BY MR. OPHOFF:

25   Q.  I want to show you what's been marked as Deposition

65

1        Exhibit Number 2; can you identify that for me?

2    A.  Yes, sir.

3    Q.  Take a look at what we've been talking about.  The

4        suggestion form is that what you're referring to when

5        you refer to the suggestion form?

6    A.  That's your suggest form.

7    Q.  Is that the suggestion form that's marked as Exhibit 1

8        to your amended complaint?

9    A.  Yes, it is.

10   Q.  Okay.  So this is your suggestion form?  This is the

11       one that you filed or gave to the Grand Rapids Public

12       Library?

13   A.  Yes, it is.

14   Q.  And the date on that is?

15   A.  9-1-06.

16   Q.  Okay.  Take a look at your suggestion form.  Is there

17       anything in your suggestion form about what you just

18       testified to as it relates to Tim's comments?

19   A.  No, sir.

20   Q.  Okay.  Nothing in the suggestion form that suggests

21       that Tim said I'll bet I can catch him?

22   A.  No, sir.

23   Q.  Okay.  And the suggestion form was printed out or

24       written approximately a year after the incident?

25   A.  Yes, sir.

66

1    Q.  Okay.  And you probably went back to the written

2        documentation that you had of the event and used that

3        to prepare your suggestion form; right?

4    A.  Yes, sir.

5    Q.  Okay.  Do you have the notes, today do you have the

6        notes that you created immediately after the September

7        '05?

8    A.  I didn't write anything down.  I went immediately home

9        and got on my computer and typed it up.

10   Q.  That's my question.  Do you still have the typed up?

11   A.  Well, it's been amended and changed.

12   Q.  So the answer to my question is no, you don't have the

13       original typed up recollection of what happened on

14       September 5?

15   A.  I typed up the original document, and I amended it.

16   Q.  Okay.  Do you have the original document?

17   A.  No, it's been amended.

18   Q.  Okay.  And the amended document that you have right

19       now, was that part of the initial complaint that you

20       filed in this?

21   A.  Yes, sir.

22   Q.  Okay.  So the document as amended, it basically is the

23       first complaint you filed?

24   A.  Pardon me?

25   Q.  The document that you created on September 5, 2005 as

67

1 amended actually is the original complaint that you

2 filed?

3 A. Yes, sir. The first amended complaint that I filed is

4 an amendment of the original.

5 Q. Okay. And for purposes of my understanding then, what

6 you did was after you were asked to leave the library

7 you went immediately back to your home?

8 A. Yes, sir.

9 Q. Okay. And you typed up immediately your recollection

10 of what happened?

11 A. Exactly.

12 Q. Okay. And that was subsequently amended or changed?

13 A. Yes, sir.

14 Q. Okay. And that amended document is what we see when we

15 look at the first complaint filed in this matter?

16 A. Yes, sir.

17 Q. Okay. And that first complaint filed in this matter

18 doesn't have anything to say about Tim and his

19 statement that's in your amended complaint I bet you I

20 can catch him?

21 A. Yes, sir.

22 Q. All right. Your complaint goes on to say that about

23 215 you were looking at a what you described as a

24 topless picture mand I'm not going to be able to

25 pronounce the name. How do you pronounce the name of

68

1 this individual?

2 A. Veronica Zemanova.

3 Q. Okay. And that topless picture was on your computer?

4 A. Yes, sir.

5 Q. And is that the computer that you brought with you

6 today?

7 A. Yes, sir.

8 Q. Okay. How long have you had that computer?

9 A. I can't remember the date I purchased it.

10 Q. Okay. Were you working when you purchased it?

11 A. No, sir.

12 Q. Okay. Where did you get the money to buy the computer?

13 A. Unemployment.

14 Q. Okay. Well, we were talking about your sources of

15 income, and I thought we'd nailed down all your sources

16 of income. We talked about section eight housing

17 assistance and government food stamps. That was about

18 it?

19 A. When I left Diesel Technology in 2000 I got

20 unemployment. I was penalized 26 weeks, and I drew

21 some unemployment. I purchased that laptop.

22 Q. Okay. So that laptop would have been purchased after

23 you left Diesel Technology?

24 A. Yes, but I don't remember when.

25 Q. Well, you said you hadn't worked since 2001?

69

1 A. Right.

2 Q. Would it have been around 2000 then?

3 A. Let's see, it was, I believe it was 2000, December of

4 2000 that I stopped working at Diesel Technology. I

5 was penalized 26 weeks by the unemployment service, and

6 then I drew unemployment. At which time I saved some

7 money and bought that laptop computer.

8 Q. How much did you pay for the computer?

9 A. I don't remember the amount.

10 Q. Was it new?

11 A. It was used.

12 Q. Okay. Why were you penalized with your unemployment?

13 A. Because I was incarcerated for driving while my license

14 was suspended.

15 Q. How many times have you been incarcerated other than

16 when you were court marshaled in Germany?

17 A. How many times have I been incarcerated?

18 Q. Yes.

19 A. I couldn't tell you it's been so many times.

20 Q. Okay. Were you incarcerated for the assault and

21 battery charged that you were convicted of?

22 A. Yes, sir.

23 Q. Okay. Where were you incarcerated?

24 A. Grand Rapids.

25 Q. In the Kent County jail?

70

1 A. Yes, sir.

2 Q. So, in addition to the speeding tickets, you've also

3 been convicted of driving while your license was

4 suspended?

5 A. That's a traffic violation; isn't it?

6 Q. Well, we're talking about speeding tickets. So, in

7 addition to the speeding tickets, we're talking about

8 being convicted of driving while license suspended?

9 A. Yes, sir.

10 Q. Okay.

11 A. That's what I mean when I say traffic violations. I

12 mean, anything related to a driving issue.

13 Q. Okay. Well, how many times have you been incarcerated

14 for driving while license suspended?

15 A. I have no idea.

16 Q. One?

17 A. I couldn't tell you. I don't know. I don't have that

18 information.

19 Q. More than one?

20 A. I believe so.

21 Q. Okay. And each time you were incarcerated for driving

22 while license suspended, were you incarcerated in the

23 Kent County jail?

24 A. Yes, sir.

25 Q. Have you ever been convicted of an alcohol related

71

1      traffic offense?

2   A.  Not to my knowledge.

     Q.  Well, you would be the one that would know.

4   A.  Not to my knowledge I have not.

5   Q.  So, beyond the speeding tickets and the driving while

6       license suspended convictions, what other traffic

7       violations have you been convicted of?

8   A.  None others that I'm aware of.

9   Q.  Okay.  And of the countless times that you've been

10      incarcerated in the Kent County jail it's always been

11      because of driving while license suspended?

12  A.  Is that what you're saying, that every time I was

13      incarcerated that's what it was about?

14  Q.  I'm saying when you were incarcerated was it because of

15      the driving while license suspended convictions?

16  A.  I have been incarcerated for speeding.

17  Q.  Okay.  For non-payment of child support?

18  A.  Non-payment of child support.

19  Q.  Okay.  And sitting here today, you don't have any idea

20      how many times you have been incarcerated?

21  A.  It's been so many times that I couldn't give you an

22      estimate.

23  Q.  Okay.

24  A.  I have been incarcerated so many times.  Non-payment of

25      child support, traffic tickets.

72

1   Q.  And for the assault and battery?

2   A.  And for assault and battery.

3   Q.  Was that assault and battery a citizen or a police

4       officer?

5   A.  I have no idea.

6   Q.  You don't know who you assaulted and battered?

7   A.  Well, I couldn't tell you.  I don't know.  I testified

8       to you that I have been incarcerated for assault and

9       battery.  What it was about, I don't know.

10  Q.  And you don't know who it was that you assaulted and

11      battered?

12  A.  No, sir.

13  Q.  I'd like to ask you this question.  Before you said you

14      had your deposition taken in another case, and I think

15      you mentioned what case it was, but my recollection

16      fails me right now.  Is that the Oklahoma City Housing

17      case that you had your deposition taken in?

18  A.  That is correct.

19  Q.  That would have been back between 1989 and 1994;

20      correct?

21  A.  That's correct.

22  Q.  Okay.  And none of the other cases that I talked to you

23      about, the cases involving the Michigan Judicial Court,

24      Michigan Works, Ameritech or Grand Rapids Housing

25      Commission, you didn't have your deposition taken in

73

1       any of those cases?

2   A.  I've testified to you I've only had my deposition taken

3       one other time, and that was in the Oklahoma Housing

4       Authority incident.

5   Q.  Any of these cases go to trial?

6   A.  On the Oklahoma Housing Authority incident.

7   Q.  Okay.  Was there a jury in that case?

8   A.  Yes, there was.

9   Q.  And what happened as a result of that litigation?

10  A.  They found the defendant not guilty, because I didn't

11      have any damages.

12  Q.  Okay.  So you lost that case or you won that case?

13  A.  I lost that case.

14  Q.  The computer that you brought here with you today, your

15      testimony is that that's the same computer that you had

16      with you in September of 2005, and that's the computer

17      that you brought into the library with you on that day;

18      correct?

19  A.  That is correct.

20  Q.  Okay.  Have you had any classes or training on the use

21      of that computer?

22  A.  Pardon me?

23  Q.  Have you had any classes or training on the use of that

24      computer?

25  A.  No, sir.

74

1   Q.  What operational software do you have running that

2       computer?

3   A.  It come with Windows Millenium, I believe it was.  I've

4       got Windows XP running on it.

5   Q.  You have Windows XP running on it now?

6   A.  Yes.

7   Q.  Was Windows XP on it in 2005 when you came into the

8       library?

9   A.  Yes, sir.

10  Q.  Okay.  So you upgraded from Windows Millenium to

11      Windows XP?

12  A.  Yes, sir.

13  Q.  What other software programs do you have running on

14      that computer or did you have running on that computer

15      in 2005?

16  A.  Other software programs, Office.  I don't remember if

17      it was Office XP that I had on it at the time, but I've

18      got Office 2003 running on it right now.

19  Q.  So you think maybe there was an Office, a Windows

20      Office or Microsoft Office software program that was

21      running on it in 2005?

22  A.  There definitely was an Office suite running on it, but

23      I don't remember if it was 2002 or 2003.

24  Q.  Okay.  And you think perhaps since 2005 you've upgraded

25      that Microsoft software?

75

1    A.  Yes, sir.

2    Q.  Okay.  Any other software programs that you have

3    running on that computer or had running on that

4    computer in 2005?

5    A.  Well, more specifically, like what?

6    Q.  Well, I haven't looked at it yet.  I'm asking you what

7    software programs you had running on the computer in

8    2005?

9    A.  I couldn't tell you.  You would have to take a look at

10    it.  I can give you an idea of what's on there.

11    Q.  Do you have a dial up modem on that computer?

12    A.  No, sir.

13    Q.  Okay.  Do you have a Wi-Fi internet access on that

14    computer?

15    A.  No, sir.  There might be a modem on it, but I don't use

16    it.

17    Q.  Have you deleted any programs or files on your computer

18    since September of 2005?

19    A.  No, sir.

20    Q.  So what we see here today is what was on the computer

21    in 2005?

22    A.  Yes, sir.

23    Q.  Okay.  Now, your testimony is that you were doing

24    research in the library in September of 2005?

25    A.  Yes, sir.

76

1    Q.  Okay.  Had you talked to anybody since you came in the

2    library at 11:00 o'clock?

3    A.  I didn't speak with no one.  I walked into the library,

4    went over to this table, sit down and set up my

5    computer, and went back in here and did some research.

6    Q.  You picked up some books in the research stack?

7    A.  Yes.

8    Q.  Probably either Federal statutes or Michigan statutes?

9    A.  Exactly.

10    Q.  Okay.  And while you were doing your research, at some

11    point you were viewing a topless picture of Veronica

12    Zemanova?

13    A.  Yes.  I actually didn't.  I didn't know what it was.  I

14    had copied it onto my computer and I was deleting some

15    files, and I didn't know what it was.  And I viewed the

16    picture, and I looked behind me and Tim was standing

17    behind me.  I was getting ready to delete the picture.

18    Q.  So it was an accident?

19    A.  Actually, it was.

20    Q.  You didn't know the picture was on your computer?

21    A.  I didn't remember what it was.  It was a picture, but I

22    didn't remember that it was a nude picture.  I didn't

23    remember what it was, and I was about to delete it.  I

24    looked at it, because I wanted to know what it was

25    before I deleted it.

77

1    Q.  Is it deleted now?

2    A.  Yes.

3    Q.  Okay.

4    A.  I deleted it at that time.

5    Q.  So what you were looking at when Tim saw you in the

6    computer is no longer on your computer?

7    A.  Right, because I deleted it at that time.

8    Q.  Where did that file come from?

9    A.  That file came from an internet website.  I was

10    connected over at my mother's house on her DSL.  I

11    copied the picture to my hard drive.  A week or two

12    later I went to the library, forgot what the picture

13    was, I brought it up on the computer getting ready to

14    delete it, and Tim saw it.

15    Q.  So the computer has internet access capability?

16    A.  Only through cat five cable.  I got a PC card.  There's

17    a PC card in here, which you attach a cat five cable,

18    just like a network cable and I can access the internet

19    at the table.  And over to my mother's on DSL I

20    downloaded the picture.  I copied it from my mother's

21    house on DSL.  I went to the library a week or two

22    later, I forgot what the picture was, and I was getting

23    ready to delete it when Tim saw it.  Some web sites

24    that you go to advertise pornography.  It's not a porn

25    site, but they have nude pictures on the website.  I

78

1    went to a website that wasn't a porn site, but it had a

2    nude picture on it, and I copied the picture to my hard

3    drive.  I forgot what the picture was, and a week or

4    two later I went to the library to do some research,

5    and I was getting ready to delete some files on my

6    computer and I forgot what that picture was, and I

7    double clicked it to bring up to see what that picture

8    was and Tim saw it.  More specifically, Tim was

9    standing behind me watching and viewing what I was

10    doing.

11    Q.  Okay.  Did Tim go past your desk assisting a mother and

12    a daughter with library stuff?

13    A.  No, sir.

14    Q.  You didn't see Tim go back by your desk with two

15    library patrons, a mother and a daughter?

16    A.  No, sir.

17    Q.  Okay.  And you never saw the mother and the daughter

18    come by your computer?

19    A.  No, sir.

20    Q.  It's only --

21    A.  Wait a minute.  I did testify that a woman walked by.

22    Now, she may have had a daughter with her, but I only

23    remember the woman going by.

24    Q.  And Tim wasn't with him?

25    A.  Tim wasn't with him.  At that time, me and Tim was

79

1    arguing about the issue of the picture in the library.
2    During that conversation some woman went by. I think
3    it was a woman.

4    Q.  Well, we'll get back to your argument with a Tim in a
5        minute. Okay. So your testimony today is that on
6        September 21, 2005, the date of this incident, you were
7        not connected to the internet in any way, shape or
8        form?

9    A.  No, sir, because I have to go to the back back here and
10       get a cat cable so that I can connect to the table. I
11       don't have a wireless. I can only connect through a
12       cat cable. I wasn't surfing the internet. I was doing
13       research.

14   Q.  And accidentally you came upon a file that you had
15       downloaded at your mother's house?

16   A.  Exactly.

17   Q.  Okay. And what was exactly in this file?

18   A.  A picture.

19   Q.  Just a picture?

20   A.  Only a picture.

21   Q.  It was a picture that was downloaded from the internet?

22   A.  From my mother's house.

23   Q.  Okay. And do you recall whether or not there was a
24       flashing banner on this picture?

25   A.  There was nothing on the picture, except it was just a

80

1    topless woman.

2    Q.  It was, and she was clothed from the waist down?

3    A.  She was either wearing underwear or swimming suit, but
4        I don't know which it was.

5    Q.  But she was clothed, at least, partially from the waist
6        down?

7    A.  Yes.

8    Q.  And you don't recall a flashing banner?

9    A.  There was no flashing banner.

10   Q.  Was there identification on this picture that you could
11       link to or connect to another website?

12   A.  No, sir. I don't remember where it was at.

13   Q.  Okay.

14   A.  It was only a picture.

15   Q.  Was there anything on --

16   A.  A JPG.

17   Q.  Is there anything on that picture that suggested if you
18       linked to view Porn Stars dot com you could see more
19       pictures?

20   A.  No, sir. It was just a picture.

21   Q.  Okay.

22   A.  It wasn't a website with a picture on it, it was just a
23       picture.

24   Q.  Which you had downloaded from the internet at your
25       mother's house?

81

1    A.  Exactly. I copied it. It was at website at my
2        mother's house. I right clicked the picture and copied
3        it to my hard drive. It was only the picture and
4        nothing else.

5    Q.  Okay. All right. Your testimony is that Tim walked up
6        behind you; correct?

7    A.  That is correct.

8    Q.  And he asked you not to view the picture in the
9        library; right?

10   A.  He told me I could not view that in the library.

11   Q.  Okay. And, at that point, your testimony is that in
12       your complaint it's I'm not on the internet. This
13       picture is on my own personal computer?

14   A.  That's the statement I made to him.

15   Q.  So you're articulating at that point you had an
16       absolute right to view that picture in the library?

17   A.  No, I wasn't articulating that. I had a right. I was
18       articulating that it wasn't associated with anything to
19       do with in the library. If he had informed me that
20       they had a policy not to allow the viewing.

21   Q.  Well, listen, I'm asking questions here, okay, I'm
22       asking questions. This is an opportunity. This isn't
23       an opportunity for you to argue, okay, so if you would
24       respond to my questions that would be great.

25   A.  All right.

82

1    Q.  Okay. A minute ago you said that you and Tim were
2        arguing about the fact that he was objecting to the
3        picture that you had on your computer; is that a
4        correct statement? He came up to you and told you you
5        couldn't watch it here; right?

6    A.  He told me.

7    Q.  And you disagreed with him? In order to argue you have
8        to disagree with him; correct?

9    A.  He told me that I couldn't view it.

10   Q.  You disagreed with him? He told you to take the
11       picture off your computer, and you disagreed and an
12       argument ensued?

13   A.  No, an argument did not ensue.

14   Q.  Did you take the picture off your computer immediately?

15   A.  I deleted it.

16   Q.  And you didn't say anything to Tim at all?

17   A.  I said to Tim, this is what I said to Tim, I said I'm
18       not on the internet. This picture is on my personal.

19   Q.  Did he ask you whether or not you were on the internet?

20   A.  No, he didn't.

21   Q.  Why did you say I'm not on the internet?

22   A.  Because he told me.

23   Q.  Did you know it was inappropriate to watch pornography
24       in the?

25   A.  I didn't watch pornography.

83

1  Q.  But you knew it would be improper to watch pornography

2      on the internet in the library; didn't you?  I mean, if

3      you had been there long enough --

4  A.  That's an assumption.  You're asking me to presume

5      that.

6  Q.  Well, you knew that if you used the library computer

7      you were not allowed to look at internet pornography,

8      right, that's why you said to him I'm not on the

9      internet?

10 A.  I can't condone that.

11 Q.  What do you mean?

12 A.  I can't say yes to that, because there was no policy.

13     There was not a sign there or anything.

14 Q.  How long did you and Tim discuss him asking you to take

15     that picture after your computer?

16 A.  He didn't ask me to take it off my computer.  He told

17     me to leave the library because it was improper for me

18     to view it in the library.

19 Q.  He told me I don't care, you can't view that in a

20     public place; right?

21 A.  That's what he said.

22 Q.  Okay.  All right.  How long did that discussion or that

23     conversation last?

24 A.  A minute or two.

25 Q.  Okay.  And you characterized it as an argument;

84

1      correct?

2  A.  Well, I had a right.

3  Q.  That's what you said?

4  A.  Well, I had a right to the public library facilities.

5      That's what my argument was.

6  Q.  And you were presenting that argument to Tim at that

7      occasion, and, at that point, you were disagreeing with

8      him and you were arguing with him?

9  A.  That's your presumption.

10 Q.  I'm asking you.

11 A.  No, I didn't make that statement.

12 Q.  But it was a minute or two that you and Tim were

13     discussing, and you called it arguing about what he

14     wanted you to do?

15 A.  Well, he told me.

16 Q.  Is that a fair statement?

17 A.  He told me to leave.  I disagreed.

18 Q.  Okay.  Is that a fair statement?

19 A.  No, it's not.

20 Q.  You weren't arguing with Tim, you were --

21 A.  I disagreed with him.  That's an argument; isn't it?

22 Q.  You were arguing with Tim, okay, and the conversation

23     that you had with him was, you know, at an elevated

24     conversational level; wasn't it?

25 A.  No, it wasn't.  It was a normal conversation.  He told

85

1      me to leave.

2  Q.  You weren't excited?

3  A.  No, sir.

4  Q.  You weren't upset?

5  A.  No, sir.

6  Q.  Okay.

7  A.  Because I knew what I was going to do.

8  Q.  File a lawsuit?

9  A.  Exactly.

10 Q.  As of 2:05 or 2:15 September 21, 2005 you knew you were

11     going to file a lawsuit.

12 A.  Exactly.  The very moment he told me to leave the

13     library.

14 Q.  Okay.  Just like you did in all the other lawsuits that

15     you filed; right?

16 A.  What are you saying?

17 Q.  This is part of what you do?

18 A.  What are you saying?

19 Q.  You file lawsuits; right?

20 A.  That's the statement that you made.

21 Q.  Well, you said you decided to file a lawsuit.

22 A.  I was.  I did.

23 Q.  Immediately after Tim told you to take that picture?

24 A.  I told you.  I'm telling you.  I'm making this

25     statement.  I'm testifying to the fact that when he

86

1      told me to leave that library because of that incident

2      I was going to file a lawsuit.

3  Q.  Were you upset?

4  A.  No.

5  Q.  You weren't upset that he told you to leave the

6      library?

7  A.  No, sir, I wasn't.

8  Q.  Didn't bother you a bit?

9  A.  No, sir.

10 Q.  And your complaint, your amended complaint says that

11     Tim asked you to leave, and you asked him I banned

12     barred from the library permanently or what.  Those

13     are, again, knowing that you had a lawsuit in mind, you

14     wanted to find out how much of a punishment that Tim

15     was actually going to meet out; right?

16 A.  I wanted to find out what he meant.  He said I had to

17     leave.  Well, what do you mean I have to leave, am I

18     banned or barred from the library.

19 Q.  Because it would be important for your lawsuit?

20 A.  Exactly, and I knew what the prerequisite was.

21 Q.  And Tim told you you were just banned for the day?

22 A.  That's what he said.

23 Q.  And that occurred about 2:00 or 2:30, and the library

24     closed what time that day?

25 A.  9:00 o'clock PM.

87

1   Q.  So you were excluded from the library for a little over
2       six hours?
3   A.  I would like to add, too, that I knew I was going to
4       file a lawsuit when I spoke with Mr. Baldridge.
5   Q.  And after September 21, 2005 you came back to the
6       library?
7   A.  Pardon me?
8   Q.  After September 21, 2005 you came back to the library?
9   A.  Yes, sir.
10  Q.  Probably to work on the complaint that you were going
11      to file against the Grand Rapids Library?
12  A.  Is that a question?
13  Q.  Yes, that's a question.  Did you come back to the
14      public library to work on the complaint that you were
15      going to file against the Grand Rapids Public Library?
16  A.  I couldn't honestly say yes or no to that.
17  Q.  Did you do any research in the times that you came back
18      after September?
19  A.  I have previously done numerous research.
20  Q.  So, in all likelihood, you came back to do legal
21      research in the library after September 21?
22  A.  It's a possibility
23  Q.  Okay.  Knowing full well that you were going to sue the
24      library?
25  A.  I knew that at the time of the incident.

88

1   Q.  Okay.  And, actually, you came back to the library the
2       same day; didn't you?
3   A.  Yes, I did.
4   Q.  After Tim asked you to leave?
5   A.  Yes, sir, I did.
6   Q.  And you came back to the library about 5:45?
7   A.  Yes, I did.
8   Q.  And you saw Tim?
9   A.  And I saw Tim.
10  Q.  Did Tim kick you out of the library when he saw you at
11      5:45?
12  A.  I asked him for a complaint form.
13  Q.  Did he kick you out of the library when he saw you at
14      5:45?
15  A.  No, sir.
16  Q.  Didn't ask you to leave?
17  A.  No, sir.
18  Q.  And you asked him for a complaint form?
19  A.  Yes, sir.
20  Q.  Told you we didn't have a complaint form, said we have
21      a suggestion form?
22  A.  Yes, he did.
23  Q.  And the suggestion form is what you used to file your
24      complaint with Mr. Baldridge in September 2006?
25  A.  Yes, sir, I did.

89

1   Q.  Did you take a suggestion form with you in September of
2       2005?
3   A.  I don't remember whether I did or not.
4   Q.  The suggestion form that's now Exhibit 2 of your
5       deposition, when did you get that form?
6   A.  I don't remember.
7   Q.  You don't remember.  You did go up to talk to Mr.
8       Baldridge that day?
9   A.  Yes, I did.
10  Q.  And Mr. Baldridge is Tim's supervisor?
11  A.  I don't know.  Mr. Baldridge is the assistant director,
12      I believe.
13  Q.  Okay.  And so, you were able to take your complaint to
14      Mr. Baldridge and express your complaint to Mr.
15      Baldridge?
16  A.  I expressed my concern.
17  Q.  Knowing full well that you were going to sue any way?
18  A.  Exactly.  Try to sue.
19  Q.  And one of the things that you wanted to do was find
20      out whether or not that Tim had the authority to ask
21      you to leave the library in the first place?
22  A.  Specifically.
23  Q.  Why did you ask that question?
24  A.  Because it would be a form of establishing whether my
25      constitutional rights were violated.

90

1   Q.  Whether or not a policy was established directing you
2       to leave the library?
3   A.  Exactly.
4   Q.  Okay.  And you were able to express your concerns to
5       Mr. Baldridge?
6   A.  Yes, sir.
7   Q.  Did you tell Mr. Baldridge that Tim told you I bet I
8       can catch him?
9   A.  Pardon me?
10  Q.  Did you tell Mr. Baldridge that Tim you overheard him
11      say I bet I can catch him?
12  A.  I didn't give Mr. Baldridge any other information,
13      other than the fact that Tim asked me to leave the
14      library.  I didn't tell Mr. Baldridge about the
15      incident after two weeks later when Tim tried to
16      intimidate me.  I didn't make that.
17  Q.  We'll get to that; okay?
18  A.  Oh, okay.
19  Q.  You spent some time with Mr. Baldridge?
20  A.  Yes, I did.
21  Q.  He listened to your complaint?
22  A.  Yes, sir.
23  Q.  And then you left?
24  A.  Yes, sir.
25  Q.  And filed your formal written complaint about a year

91

1 after this entire, about the same time you filed your

2 lawsuit?

3 A. Yes, sir.

4 Q. Okay. Now, you've attached an affidavit to your

5 amended complaint as well; correct?

6 A. Yes, I did.

7 Q. See if I can find it here. When did you draft this

8 affidavit?

9 A. I have no idea.

10 Q. Would this have been contemporaneous with the incident;

11 do you know?

12 A. Pardon me?

13 Q. Would this have been drafted about the time you were

14 asked to leave the library?

15 A. I don't remember when I drafted that.

16 Q. Well, you signed it on September 5, 2006. Was that

17 about the time that it was drafted?

18 A. I couldn't tell you when that was drafted. There's a

19 difference in drafting and signing. I don't remember

20 when I wrote it up.

21 (Deposition Exhibit 3 marked at 1:43 PM)

22 BY MR. OPHOFF:

23 Q. The deal is here you get to answer questions; okay?

24 You get your opportunity to make a statement at the end

25 of the deposition. I show you what's been marked

92

1 Exhibit 3. Can you identify that for me, Mr. Williams?

2 A. Yes, I can. It's the affidavit of Donald Williams.

3 Q. Is that Exhibit 2 to your amended complaint?

4 A. Yes, it is.

5 Q. Okay. Why don't you take a look at the last page of

6 that affidavit? Does that give you an indication of

7 when that particular affidavit was signed?

8 A. Yes, it does.

9 Q. When was it signed?

10 A. It says Tuesday, September 5th.

11 Q. Is that the same day that you filed your suggestion

12 form with the library?

13 A. I don't know.

14 Q. Okay. What's the date on the suggestion form?

15 A. 9-1-06.

16 Q. Can you tell me whether or not that's the date that you

17 filed your suggestion form with the library?

18 A. I don't know if that's the date that I filed it or not.

19 Q. You don't know when you filed your suggest form with

20 the library?

21 A. I don't know when I filed the suggestion form.

22 Q. Would it have been around September 1, '06?

23 A. It could have been the 2nd or 3rd.

24 Q. And your affidavit is dated September, what did you

25 say, 5?

93

1 A. Yes.

2 Q. 2006; correct?

3 A. That is correct.

4 Q. About the same time as the suggestion form? As these

5 are both, is that a yes or no?

6 A. What are you saying? What's the question?

7 Q. Well, both these documents were created about the same

8 time?

9 A. Did you say created?

10 Q. Yes.

11 A. I don't know when they were created. I don't know when

12 I drafted them.

13 Q. One is dated on the top September 1, 2006. That's a

14 suggestion form. You don't know when you created it,

15 though?

16 A. I don't know when I wrote that up.

17 Q. The affidavit is signed September 5, 2006, but you

18 don't know when this was written up?

19 A. I don't keep a journal of my actions.

20 Q. Is there anything in the affidavit that suggests that

21 Tim said I bet I can catch him?

22 A. That wasn't the purpose of the affidavit.

23 Q. Is there anything in the affidavit that says I bet I

24 can catch him as you claim he said?

25 A. Not to my knowledge.

94

1 Q. Okay. Would it be fair to say, Mr. Williams, what you

2 recall about the particular incident was mainly

3 influenced by what you drafted almost immediately after

4 the incident in September of 2005?

5 A. No, it wouldn't.

6 Q. That's not the best recollection of what happened on

7 September 21, 2005?

8 A. No, sir.

9 Q. What is the best recollection of what happened on that

10 particular date?

11 A. The amended complaint.

12 Q. The amended complaint?

13 A. That would be the best recollection that I could recall

14 on that date.

15 Q. Which was filed after you filed the initial complaint?

16 A. Yes, sir.

17 Q. And nothing in the original complaint saying anything

18 about what you attributed to Tim; correct?

19 A. You asked me that question before.

20 Q. And your answer is yes?

21 A. That's correct.

22 Q. Okay. And it is a fact that when you went home and

23 wrote everything down on September 21, 2005 you had in

24 your mind that the reason you were writing this down is

25 because you were going to file a lawsuit?

95

1    A.    Exactly.

2    Q.    Exactly.  And so, what you remember as of December 21,

3          2005 was influenced by the fact that you were getting

4          ready to file a lawsuit against the Grand Rapids Public

5          Library; wouldn't that be a fair statement?

6    A.    No.  It would be a fair statement to state that my

7          constitutional rights were violated, and that's why I

8          filed a lawsuit.

9    Q.    Okay.  You knew your constitutional rights were

10         violated as you were walking out of the library?

11   A.    Yes, sir.

12   Q.    On September 21, 2005 about 3:00 o'clock in the

13         afternoon?

14   A.    About 2:15, 2:30.

15   Q.    Okay.  And when you went back to your apartment and sat

16         down at your computer and drafted your recollection of

17         what happened, it was having in mind that this was

18         going to be the basis or foundation for a complaint

19         against the Grand Rapids Public Library?

20   A.    Yes, it was.

21   Q.    Okay.  Thank you.  Have you ever accessed the internet

22         at the Grand Rapids Public Library?

23   A.    Yes, sir.

24   Q.    How did you access the internet?

25   A.    With my laptop computer and a cable from the library

96

1          that I connect to their network with.

2    Q.    How often had you connected to the internet at the

3          library prior to September 21, 2005?

4    A.    I generally go to the library once or twice a week.

5    Q.    And you accessed the internet each time you went?

6    A.    Not specifically, no.

7    Q.    But generally?

8    A.    No, I can't say generally.  Generally would be

9          specifically.  I couldn't say that I do every time I go

10         there.  Sometimes I do, sometimes I don't.

11   Q.    Once a week?

12   A.    I couldn't say.

13   Q.    Okay.  After September 21, 2005 you said that you went

14         back to the library on a number of occasions again if

15         you wanted to, and I expect at some point you would

16         have gotten a cable and connected to the internet again

17         at the library?

18   A.    That's correct.

19   Q.    Okay.  So you're familiar with the popup page that the

20         Grand Rapids internet access has, has a paragraph or

21         two that you have to agree to before you can get access

22         to the internet?

23   A.    I'm not too sure I'm familiar with what you're talking

24         about.  Are you saying the Grand Rapids Public Library

25         has a page that pops up before you access the internet?

97

1    Q.    Yes.

2    A.    I see.  I think I've seen that before.

3    Q.    Okay.  Have you ever seen a statement that you have to

4          click on to agree to, which says you will abide by City

5          of Grand Rapids policies and procedures, library's

6          policies and procedures accessing the internet?

7    A.    Yes, sir.  But I wasn't accessing the internet at the

8          time of this incident.

9    Q.    Okay.  But you clicked on that before?

10   A.    Yes, sir.

11   Q.    And you know what those policies and procedures are?

12   A.    Yes, sir.

13   Q.    Now, your testimony, well, again, in your amended

14         complaint you indicate that after about two weeks after

15         September 21, 2005 you came back to the library.  Is

16         that the first time that you came back to the library

17         after September 21, 2005?

18   A.    No, sir.  No, sir.

19   Q.    Okay.  You'd been back before after that?

20   A.    Yes, sir, but about two weeks after.

21   Q.    Two weeks later your complaint said that Tim came up to

22         you out of the blue for no apparent reason and asked

23         you is there anything that I can do for you?

24   A.    Very sarcastically, very intimidatingly.

25   Q.    Okay.  And what was your response?

98

1    A.    I just dropped my head and shook my head, because I

2          knew he was trying to intimidate me.  And I didn't want

3          to create an incident, because I knew I was going to

4          file a complaint.

5    Q.    Were you in the reference section of the library again?

6    A.    I was all the way in the back right here at this table.

7          Here this table.  Or is it this table.  It's this

8          table.

9    Q.    Why don't we circle it.  You think it's this table

10         here?

11   A.    Yes, sir.

12   Q.    Circle in black which chair were you sitting at?

13   A.    I was sitting at this chair here.

14   Q.    This chair here?

15   A.    Yes, sir.

16   Q.    Okay.  After September 21, 2005 that's way we'll

17         identify that one; is that fair?

18   A.    That's fair.

19   Q.    Put a box here.  Put your initials in there.  Did he

20         say anything else to you that day?

21   A.    No, sir.

22   Q.    Just is there anything that I can do for you?

23   A.    Yes, sir.

24   Q.    And you perceived this to be a very menacing statement?

25   A.    He said it very sarcastically.

99

1 Q. But you knew that you were going to file a lawsuit
2 against him, so you didn't say anything back to him?
3 A. That's exactly why I didn't say nothing.
4 Q. Is there anybody else sitting at this table that heard
5 the statement?
6 A. No, sir. There was a person sitting at this reference,
7 there was a person sitting back here that gives the
8 cables out so people can connect.
9 Q. So you were connected to the internet at that point?
10 A. I had just got ready to. I had just set my computer
11 up.
12 Q. Was that person a male or female?
13 A. I believe it was a female at the time.
14 Q. And you think that was, approximately, two weeks after
15 September 21, 2005?
16 A. No more than two weeks. It might have been only a
17 week.
18 Q. Did you know Tim was working the day that you came
19 back?
20 A. No, sir.
21 Q. You hadn't seen him before you sat down at the desk and
22 asked for that cable?
23 A. No, sir.
24 Q. Okay. Had you seen Tim in the library before September
25 21, 2005?

100

1 A. When I first started going to the library, let's say
2 hypothetically speaking, in oh, 2002, 2003, I asked Tim
3 for some assistance one time in 2002 or 2003. Since
4 then I have not had any conflict or anything to do with
5 Tim. Not hi, hello, good-by or I'm sorry or anything.
6 Q. Had you seen him in the library?
7 A. I've seen him in the library.
8 Q. And, by your testimony, the first time that he really
9 ever said anything to you was on September 21, 2005?
10 A. That's the first time.
11 Q. And the second time he ever said anything to you was
12 two weeks later when he asked may I help you?
13 A. That's the second time.
14 Q. Has he said anything else to you?
15 A. I haven't been back.
16 Q. Well, you haven't been back since you filed your
17 lawsuit in September 2006?
18 A. Right. Nothing after that incident.
19 Q. So from September 21, 2005 to September whatever the
20 date was in 2006 that you filed your lawsuit, every
21 time that you came back to the library, other than that
22 one incident two weeks after September 21, 2005, Tim
23 has never said anything to you?
24 A. No, he hasn't.
25 Q. Have you ever seen him there?

101

1 A. I believe so.
2 Q. Okay. And in your complaint it says tells me attitude
3 was menacing. What exactly does that mean?
4 A. Spiteful.
5 Q. Was that based upon the way he said it, the way he said
6 is there anything that I can do for you?
7 A. The man was trying to intimidate me.
8 Q. He said it in a spiteful way?
9 A. He said it in a very sarcastic and disrespectful way
10 like I kicked you out I can do it again.
11 Q. He didn't say it, though?
12 A. No, he didn't say it.
13 Q. But that's what you assumed?
14 A. That's what the meaning was.
15 Q. That's what you assumed?
16 A. That's what his demeanor was. He walked away like a
17 cocky guy or bully or something.
18 Q. Well, let's go back to your original complaint. Is
19 there anything in your original complaint as filed that
20 mentions this incident two weeks after September 21,
21 2005?
22 A. Is there anything in my original complaint that
23 mentions?
24 Q. Yes.
25 A. Something about Tim?

102

1 Q. No. About the incident that we have just been talking
2 about. Is there anything I can do for you incident.
3 Is that referenced at all in your original complaint?
4 A. Not in the original.
5 Q. Is that referenced in your affidavit?
6 A. No, sir, it's not.
7 Q. Is that referenced in your suggestion form,
8 A. No it's not.
9 Q. The only place that shows up in is in your amended
10 complaint; correct?
11 A. Are you saying it didn't happen?
12 Q. I'm asking you a question. It is true that this is the
13 only place it shows up; correct?
14 A. That's correct.
15 Q. Just in the amended complaint?
16 A. That's correct.
17 Q. Okay.
18 A. And if you look at the end of the amended complaint
19 there's a declaration under penalty of perjury that the
20 statements are true.
21 Q. Well, was it important to you when this happened?
22 A. Pardon me?
23 Q. Was it important to you that Tim came up to you or you
24 say Tim came up to you two weeks after September 21,
25 2005, is there anything that I can do for you? That

103

1    was an important thing; right? That was an important
2    part of your lawsuit. I mean, you set it out in your
3    amended complaint. You knew it was going to be an
4    important part of your lawsuit; right?
5 A. What are you asking me?
6 Q. I'm wondering why you didn't put it in the first
7    complaint. It's a whole separate cause of action;
8    isn't it?
9 A. Because I didn't realize the extent -- okay, I'm going
10    to answer your question.
11 Q. You base your discrimination claim based on the --
12 A. That's exactly why I put it in there.
13 Q. Is there anything I can do for you. He says those
14    words and he's discriminated against you. In fact you
15    call him a racist based on that statement?
16 A. Yes, I do.
17 Q. It's in your first complaint?
18 A. Because I didn't realize what all my claims were going
19    to be in the first complaint.
20 Q. Well, is it true or not?
21 A. I signed a declaration under penalty of perjury.
22 Q. And it's only became important when you decided to add
23    your discrimination complaint?
24 A. Well, as you very well know, you are a lawyer, you know
25    what res judicata is; right.

104

1 Q. Well, is it in the affidavit?
2 A. No.
3 Q. It's not in the suggestion form. The only place it
4    shows up is in the amended complaint?
5 A. What's your point? I signed a declaration under
6    penalty of perjury it happened.
7 Q. Which was filed what in March of 2007. Is that when
8    you filed your amended complaint? I think so. Do you
9    recall when you filed your amended complaint?
10 A. No, sir, I don't.
11 Q. Well, it says here February 27, 2007, so nearly a
12    year-and-a-half after the actual event then it first
13    shows up. Isn't that a little suspicious?
14 A. No, sir, it's not.
15 Q. Okay. I'd like to talk to you a little bit about your
16    damage claims as well.
17 A. Okay.
18 Q. Your total relief requested based on being asked to
19    leave the library for six hours and for one menacing,
20    you say menacing comment from Tim is 15 million
21    dollars, correct, that's what you're looking for?
22    That's damage conclusion, Exhibit 3 to your complaint;
23    is that right?
24 A. That's correct.
25 Q. Now, I asked you or you provided for me as part of your

105

1    initial disclosure in this matter the names of two
2    treating physicians that you say you went to?
3 A. I didn't say I went to them.
4 Q. Okay. Well, let's get this down straight so we know
5    what we are talking about here. You've listed two
6    psychologists as your witnesses; correct?
7 A. That's correct.
8 Q. An Arthur E. Jongsma, PhD. You have an address here
9    and a witness who will testify concerning stress.
10    That's in your roll 26 disclosures?
11 A. That's correct.
12 Q. You also listed David MacCrae, M-a-c-C-r-a-e, who is
13    identified somebody who will be able to testify as
14    someone who witnesses stress; is that correct?
15 A. That's correct.
16 Q. Have you ever seen or talked to Arthur Jongsma?
17 A. No, sir.
18 Q. Have you ever been to his Office?
19 A. No, sir.
20 Q. Have you ever told Mr. Jongsma or Arthur Jongsma that
21    you listed him as a witness?
22 A. No, sir.
23 Q. What do you expect that Arthur Jongsma is going to say
24    about stress?
25 A. That would be a question to ask the plaintiff's

106

1    attorney.
2 Q. You have absolutely no idea what Arthur Jongsma is
3    going to say about stress?
4 A. That would be determined by my line of questioning to
5    him if there's a trial.
6 Q. You've never talked to him?
7 A. I've never talked to him.
8 Q. You don't know what he'd say about stress?
9 A. I have no idea.
10 Q. And you've never went to him and talked to him about
11    your feelings related to the incident?
12 A. No, sir.
13 Q. What about Dr. MacCrae?
14 A. No, sir.
15 Q. Have you ever met the man?
16 A. No communication at all whatsoever.
17 Q. Have you ever met the man?
18 A. No, sir.
19 Q. What about Arthur Jongsma, have you ever met him?
20 A. No, sir.
21 Q. These are two names that you pulled out of a phone book
22    that will testify about stress?
23 A. Yes, sir.
24 Q. Have you ever talked to anybody about Arthur Jongsma or
25    David MacCrae?

107

1    A.  No, sir.

2    Q.  So when I say you pulled names out of a phone book, you

3        probably did?

4    A.  That's what I testified to.  I said yes.

5    Q.  So I've got medical releases here for you to sign today

6        for Dr. Jongsma and Dr. MacCrae, but I don't even need

7        those because you've never been to see either one of

8        them?

9    A.  That's correct.

10   Q.  They have no records on you?

11   A.  That's correct.

12   Q.  They don't know you from Adam?

13   A.  That's right.

14   Q.  And you expect to have them come into court and testify

15       about stress?

16   A.  That's what I expect.

17   Q.  You have no idea what they're going to say?

18   A.  I have no idea.

19   Q.  Okay.  I'd like to go through your damages here, if we

20       could.  You claim compensatory relief in the amount of

21       3 million dollars, personal humiliation.  Your

22       statement is, told you could not view nude picture in

23       the library and to leave the library in violation of

24       civil rights to library facilities, could not redress

25       violation of civil rights, humiliated by defendant's

108

1        abuse of authority?

2    A.  That's what I stated.

3    Q.  I thought you also testified that what Tim said to you

4        and directed you to do is leave the library didn't

5        bother you?

6    A.  It didn't.

7    Q.  Didn't upset?

8    A.  Not at that time, not between me and Tim, but I'm angry

9        about my civil rights being violated.

10   Q.  Okay.

11   A.  There's a difference.

12   Q.  So the personal humiliation is something that's really

13       occurred afterwards?

14   A.  No.  It occurred at that time, but I took it on the

15       cheek like someone who was to hit me on the chin.  I

16       just took it.

17   Q.  Well, I'm having trouble understanding here then,

18       because you have told me it didn't bother you.  You

19       weren't upset about it, and you just left the library.

20   A.  Just like when Tim came up to me and said is there

21       anything that I can do for you.

22   Q.  That was humiliating?

23   A.  I just dropped my head, because I knew that if I

24       responded it would just create an incident.

25   Q.  Okay.  Have you seen any of the people that were around

109

1        there that might have seen this particular incident

2        again?  Have you ever seen them in the library again?

3    A.  Yes, I have.

4    Q.  Have they ever said anything to you about what happened

5        on September 21, 2005?

6    A.  No.

7    Q.  Have you ever talked to them about it?

8    A.  No, sir.

9    Q.  Okay.  Says here you have an impairment of your

10       reputation?

11   A.  Right.

12   Q.  Okay.  A million and a half dollars?

13   A.  That's right.

14   Q.  Okay.  The loss of good name and lack of integrity by

15       cruel and unusual punishment?

16   A.  That's right.

17   Q.  Okay.  And that all relates to Tim asking you to turn

18       off the nude picture or semi nude picture of this

19       person that was on your computer?

20   A.  That's related to being segregated from the public

21       library.

22   Q.  For six hours?

23   A.  For a minute.

24   Q.  A minute, okay.

25   A.  Deprivation of my constitutional rights are against the

110

1        law.

2    Q.  Okay.  You also talk about mental anguish and emotional

3        anguish?

4    A.  Yes, sir.

5    Q.  You asked for two million dollars related to those

6        particular components.  Now, we've already established

7        that you never talked to any psychologists or counselor

8        or anybody else about the mental and emotional stress;

9        correct?

10   A.  That's correct.

11   Q.  And you know enough at this point to know if you're

12       going to file a lawsuit, which you knew when Tim said

13       turn that picture after your computer, you knew then

14       you were going to file the lawsuit?

15   A.  Not when he said.

16   Q.  You knew at that point that you were also going to have

17       to come up with damages; right?

18   A.  No, sir.

19   Q.  Well, you filed one, two, three, four, five, six, at

20       least?

21   A.  Let me answer the question.  You asked me two different

22       questions in one statement.

23   Q.  You knew you would have to claim damages in a lawsuit

24       that you filed; correct?

25   A.  I don't know.

111

1. Q. You don't know that you claim damages in any lawsuit
2. that you filed?
3. A. I'm not a lawyer.
4. Q. So if I go back and look at the summons and complaints
5. in each of those lawsuits that are listed in this order
6. here, I'm not going to find a claim for damages of
7. several millions?
8. A. I don't know what you'll find.
9. Q. You don't remember claiming damages in any of these
10. lawsuits?
11. A. Well, you asked me a legal question.
12. Q. I'm asking you whether or not you claimed damages of
13. several million dollars in each one of those lawsuits.
14. That's the lawsuit.
15. A. I don't know.
16. Q. You don't remember?
17. A. I do know I filed a lawsuit, but I don't know what the
18. amount of damages were.
19. Q. Okay. You claimed damages in each one of those
20. lawsuits; right?
21. A. I don't know. Maybe I only claimed injunctive relief.
22. I don't know whether I did or not.
23. Q. Well, how did you come up with the numbers of three
24. million dollars for compensatory relief and mental and
25. emotional distress at two million dollars?

112

1. A. I don't know what the rules or statutes for that is.
2. Q. And you've got ten million dollars down here for
3. punitive relief. What is punitive relief?
4. A. That's a legal question; isn't it?
5. Q. Well, you've got it in your complaint. I'm trying to
6. find out what you mean by punitive relief. What does
7. that mean for you?
8. A. Well, right now I'm the plaintiff. I'm not acting as a
9. lawyer right now.
10. Q. Well, you filed this complaint in proper?
11. A. You're right, I did.
12. Q. So when you signed this thing you're swearing to the
13. truth of it?
14. A. I did swear to the truth of it.
15. Q. I'm asking you right now what do you mean by punitive
16. relief?
17. A. What are punitive damages?
18. Q. You don't know?
19. A. Do you know, no.
20. Q. Is that a fair statement you don't know at this point?
21. A. What does the statement say concerning that?
22. Q. So your understanding of punitive damages is set out in
23. your calculation of damages here?
24. A. That's about the size of it.
25. Q. And it's ten million dollars?

113

1. A. Well, I don't know what the rules are for establishing
2. punitive damages.
3. Q. Well, you're the guy that's in the library researching
4. this a lot. You've never researched damages before?
5. A. There's not enough information to do research on
6. damages.
7. Q. And it would be fair to say that the only proof on
8. damages that if this matter goes to trial that we're
9. going to have will be from you?
10. A. Pardon me?
11. Q. The only proof on damages, the only proof that you
12. should receive compensatory relief in the amount of
13. three million dollars is going to come from you; right?
14. A. The only proof.
15. Q. You're the person that was personally humiliated and
16. the person that had his reputation impaired; correct?
17. A. Well, I don't know, because if either of the
18. psychologists testified they might be able to establish
19. what mental and emotional stress is.
20. Q. But they're not going to be able to tell whether you
21. were personally humiliated or had your reputation
22. impaired. They've never talked to you. How are they
23. going to know?
24. A. Well, how do you know it didn't happen?
25. Q. Well, let me ask the question a different way.

114

1. A. Okay.
2. Q. Who else are you going to call to prove compensatory
3. damages in the amount of one point five million
4. dollars? What other witnesses?
5. A. I have another witness.
6. Q. Well, you've disclosed yourself?
7. A. Discovery is not closed.
8. Q. Well?
9. A. I just got this witness here.
10. Q. I'm not surprised.
11. A. A week ago.
12. Q. As far as your rule 26 disclosures are concerned,
13. you've got three witnesses?
14. A. Those were my initial. During the discovery I sent you
15. a letter requesting all the books in the public library
16. concerning art and photography you sent me a letter.
17. Q. And you withdrew that request?
18. A. No, that was, that was.
19. Q. Well, let me ask you this, okay, who do you think is
20. going to be an additional witness in this case right
21. now?
22. A. I have no.
23. Q. You don't have any idea?
24. A. I have an affidavit, and I'm going to submit some other
25. information to you here shortly before the close of

115

1    discovery.

2    Q.  Who signed the affidavit?

3    A.  They signed the affidavit.

4    Q.  Who signed the affidavit?

5    A.  I'm not willing to give you that information right now.

6    Q.  So as we sit here today, May 18, 2007 you've disclosed

7        to me three witnesses?

8    A.  Two witnesses.

9    Q.  You've listed yourself as a witness?

10   A.  Oh, well, including me, yes, three.

11   Q.  Arthur Jongsma and David MacCrae?

12   A.  That's correct.

13   Q.  And, as far as I can tell, you're the only one that's

14       going to be able to testify about your personal

15       humiliation and your personal impairment of reputation?

16   A.  That's correct.

17   Q.  Okay.  And, as far as we can tell today, you're the

18       person that's going to have to testify about your own

19       mental anguish?

20   A.  No.  I think the psychologist will be able to

21       substantiate that.

22   Q.  You've never seen him and you've never talked to him;

23       right?

24   A.  Well, whether I've never seen him or never talked to

25       him doesn't preclude that they can't support that it

116

1    happened, that mental stress or emotional stress

2    happened.  They could still substantiate it.

3    Q.  Potentially, but you don't know what they're going to

4        say?

5    A.  I don't know.

6    Q.  Okay.  Same for emotional anguish.  You're the person

7        that's most directly involved?

8    A.  I'm not here to determine.

9    Q.  You're guessing --

10   A.  The court will have to decide that.

11   Q.  You're guessing that Arthur Jongsma or David MacCrae

12       might be able to say something about stress?

13   A.  You're right.  I am guessing.

14   Q.  Okay.  And, as far as punitive damages are concerned,

15       again, you're the person that's going to offer the

16       testimony relating to punitive damages, correct, the

17       malicious and wanton conduct by both public officials?

18   A.  Yes, sir.

19   Q.  That's what we're talking about, your testimony?

20   A.  I'm going to testify.

21   Q.  Okay.  All right.  Can you tell me how you came up with

22       three million dollars for compensatory relief?

23   A.  I don't know what the rules are.  It's just an

24       estimate.

25   Q.  You could have claimed 3 dollars, could have claimed

117

1    300 dollars, could have claimed 3,000 dollars, you just

2    chose three million dollars?

3    A.  It's just an estimate.

4    Q.  A guess?

5    A.  A guess.

6    Q.  Okay.  Same for emotional?

7    A.  I'm not a lawyer, Mr. Ophoff.

8    Q.  Same for mental and emotional?

9    A.  I have no idea what those, what the psychiatrists are

10       going to say that the cost for that is.  I don't know.

11   Q.  Same for mental and emotional stress relief?

12   A.  I don't know what the cost could be.

13   Q.  It's a guess?

14   A.  I don't know.

15   Q.  It's a guess?

16   A.  I guess.

17   Q.  Punitive relief, same thing?

18   A.  Well, I have seen statutes for 720 thousand per civil

19       right violation.  I have seen a statute for that.

20   Q.  You don't site that in your pleadings; do you?

21   A.  No, I don't.

22   Q.  Okay.  Is that cited in the case you have here?

23   A.  No, sir.  Again, I don't know what the rules for that

24       would be.  The court would have to decide that.

25   Q.  Why haven't you gone back to the library after you

118

1    filed your lawsuit?

2    A.  Because I don't want an incident.

3    Q.  So when you went back to the library between September

4        21, 2005 and September 2006, 2006 you were looking for

5        an incident?

6    A.  No, sir.  I'm talking about a conflict of interest

7        between a defendant and myself, the plaintiff.

8    Q.  A conflict of interest?

9    A.  Right.

10   Q.  Okay.  So you're not afraid to go back to the library?

11   A.  No, I'm not.

12   Q.  Okay.  And based on your past experience there's no

13       reasonable likelihood that you're going to be excluded

14       from the library, I mean, you've been there regularly?

15   A.  Yes, I have.

16   Q.  Okay.  You're not afraid to go back to the library?

17   A.  But that doesn't condone the fact.

18   Q.  You're not afraid to go back to the library?

19   A.  No, I'm not.  I'm not afraid.

20   Q.  And if you hadn't filed this lawsuit you could have

21       gone back to the library, you would have went to the

22       library regularly?

23   A.  Yes, I would have.

24   Q.  Where do you do your legal research now?

25   A.  I don't.

119

1    Q.  Mr. Williams, I have somebody who will be able to
2        access your computer and take a look at what's on the
3        hard drive.
4    A.  But you can't do that without a court order; right?
5        The judge said that he would issue an order if it was
6        necessary for you to look at the laptop; remember?
7    Q.  You brought your laptop with you today, it's here to
8        inspect?
9    A.  You can inspect it.
10   Q.  I have someone who can look at it and tell me what's on
11       the computer.  Are you willing to allow me to do that?
12   A.  No, sir.
13   Q.  So you brought it.  I got a, I can see it, but you're
14       not going to let me see what's on the computer?
15   A.  Mr. Ophoff, you can inspect the laptop computer.
16   Q.  So I'm going to call up someone from our IT department
17       and ask him to fire it up and take a look at it?
18   A.  No, sir.  You can inspect the lap top computer as it
19       sits here.
20   Q.  But you're not going to allow me the opportunity to
21       turn it on and look what's on it?
22   A.  No, sir.
23   Q.  Is there anything on it that you're ashamed of?
24   A.  No, sir.  There's nothing on it for you to see.  It's
25       just got this case file on there.  Everything that's in

120

1        this case is on there.
2    Q.  And that's it?
3    A.  Music files, picture files.
4    Q.  Picture files that you've downloaded from the internet?
5    A.  No.  Picture files that I use as a screen saver.
6    Q.  Okay.  Well, let me ask you one more time.  We're here,
7        you've got your computer here, and I have an IT
8        individual that I would like to be able to come up here
9        to look at your computer to start it up.  Are you going
10       to allow me to do that?
11   A.  You need a court order for that.
12   Q.  I'm asking you to do it.
13   Q.  You're asking me to willfully allow you, to permit you.
14   Q.  Yes or no?
15   A.  I thought I answered that.
16   Q.  So you're refusing me access to be able to look inside
17       your computer, fire it up and look at what's there?
18   A.  Didn't I say that?
19   Q.  Okay.  Well, what I would like to do at this point is
20       adjourn the deposition for the time being and call over
21       to Judge Scoville; okay?
22   A.  Okay.
23   Q.  And what I'd like to be able to do is have the judge
24       give us some instruction as to whether or not I can go
25       ahead and look at what's on your computer.

121

1    A.  Okay.
2        MR. OPHOFF:  So let's adjourn the deposition.
3        I'll go down and call the judge, and we'll see where
4        this goes.
5        (Off the record at 11:52 AM)
6        (Back on the record at 1:55 PM)
7        MR. OPHOFF:  We are back on the record in the
8        matter of Donald Williams versus Grand Rapids Public
9        library.  We went off the record at about 12:00 o'clock
10       after I requested Mr. Williams provide me access to his
11       computer, and he denied me access to that computer,
12       that is, turning it on and looking at the files in the
13       computer.
14       The computer is here today.  I filed and,
15       actually, I called the judge in this case, Magistrate
16       Judge Scoville's Office to get some sort of preliminary
17       ruling on this issue.  The judge hasn't returned my
18       call.
19       It's now about 2:00 o'clock, and what I have
20       decided to do is finish the deposition here and file a
21       motion with the court for production and inspection of
22       the computer, if need be.  Mr. Williams, do you have
23       anything to say about this?
24       THE WITNESS:  No, sir.
25       MR. OPHOFF:  Okay.  I just have a couple more

122

1        questions that I'd like to ask you, and then if you
2        have something to say we'll open it up to you; okay?
3        THE WITNESS:  Yes, sir.
4    BY MR. OPHOFF:
5    Q.  I've gone through your complaint, and I've looked at
6        the various allegations in it.  And I'm going to ask
7        you whether or not you believe it is an accurate
8        statement that you had an absolute right to view the
9        picture of the semi nude female individual on your
10       laptop computer on the date in question?
11   A.  There was never an issue of me viewing the picture.
12   Q.  Well, my question to you is that is it a fair statement
13       of your position that you believe you have an absolute
14       right to view that picture in the public library?
15   A.  That would be my opinion.
16   Q.  That's your position?
17   A.  No, you're asking my opinion.
18   Q.  I'm asking what your position is in the lawsuit.
19   A.  I haven't made a claim that I had a right to view the
20       picture.
21   Q.  Did you represent to either Mr. Baldridge or Tim on
22       September 21, 2005 that you, in fact, had an absolute
23       right to view what you were viewing?
24   A.  I never made that statement.
25   Q.  When you came to the library on September 21, 2005, did

123

1    you have in your mind any thought that viewing the

2    picture that you viewed in the library would cause you

3    problems?

4  A.  I didn't know that I was going to view it. I didn't

5     have any idea that this incident was going to occur.

6  Q.  Today, as you sit here in your deposition, do you

7     believe that you have an absolute right in a public

8     library to view the picture that you viewed? Does the

9     constitution guarantee and protect that right as far as

10    you're concerned?

11 A.  I don't know. I would have to do some research.

12 Q.  You don't know the answer to that question?

13 A.  I don't know the answer to that question.

14 Q.  And that's not an argument that you made to either Mr.

15    Baldridge or to Tim?

16 A.  No, sir.

17 Q.  Okay. Your argument with them was more based on

18    whether or not you were connected to the internet?

19 A.  No. My argument with them is that it was unlawful for

20    them to segregate me from the library for viewing the

21    picture.

22 Q.  Okay.

23 A.  Not that I had a right to view it, but that they barred

24    me out for viewing it.

25 Q.  Okay. Well, I'm not understanding the distinction.

124

1    What is the distinction according to you?

2  A.  What, between being able to view it?

3  Q.  An absolute right to view and being barred for viewing

4     it.

5  A.  I'll let you make that decision.

6  Q.  You don't know the difference?

7  A.  I do know the difference for me.

8  Q.  What is the difference for you?

9  A.  I stated that in my complaint. There is no claim in my

10    complaint about an absolute right to view a nude

11    picture in a public library, but there is a claim in my

12    complaint for the deprivation of constitutional rights

13    for viewing a nude picture.

14 Q.  So you have a constitutionally protected right to view

15    that nude picture in the library? That's what your

16    position is?

17 A.  No. My position is deprivation of constitutional

18    rights, that being segregated from the library for

19    viewing a nude picture.

20 Q.  I don't think we're going to get any place on that one.

21    At this point.

22    MR. OPHOFF: At this point, I don't think I have

23    any more questions for you, Mr. Williams, and for now

24    what I'll do is I'll end my deposition of you. And so,

25    at this point, if you have something that you'd like to

125

1    say on the record for purposes of, you know,

2    cross-examining yourself, I guess, you're welcome to do

3    that.

4    THE WITNESS: Well, thank you, Mr. Ophoff, but I

5    won't waste any more of your time.

6    MR. OPHOFF: You don't want to put anything more

7  on the record?

8    THE WITNESS: No, sir.

9    MR. OPHOFF: Then this deposition is over.

10   (Deposition ended at 2:01 PM)

126

1    STATE OF MICHIGAN )

2                     ) ss.

3    COUNTY OF KENT    )

4

5    I, Shawn Breimayer, (CSR-6888) do hereby certify that the

6    foregoing deposition consisting of 126 pages, is a complete,

7    true and correct transcript of the deposition proceedings and

8    testimony of Donald Williams, held in this case on Friday, May

9    18, 2007; and do also certify that the foregoing transcript is

10   a true and correct transcript of my stenographic notes of said

11   deposition so reported and transcribed by me.

12

13   I further certify that I am neither attorney or counsel for,

14   nor related to or employed by any of the parties to the action

15   in which this deposition was taken; and further, that I am not

16   a relative or employee of any attorney or counsel employed by

17   the parties hereto, or financially interested in the action.

18

19   Dated: May 30, 2007

20

21

22   Shawn M. Breimayer, CSR

23   Notary Public, Ionia County, MI

24   Acting in Kent County, MI

25   My Commission Expires: 3-20-2013







**GRAND RAPIDS PUBLIC LIBRARY**

# Suggestion Form

DEPOSITION EXHIBIT
2
9B 5-18-07

**Date:** 9/1/06

**Name of Library:** Grand Rapids Public Library, 111 Library St. SE
Grand Rapids, MI 49503

**Comments:** On 9/21/05 in the Grand Rapids Public Library, GRPL, I went to a table and setup my laptop computer. At 2:15pm I viewed a topless picture of Veronica Zemanova and I looked behind me and Tim, GRPL employee, was standing 8-15 feet behind me, watching and viewing what I was doing on my laptop computer — invasion of privacy. Tim walked up from behind me and told me "You can't view that in here." I told Tim "I'm not on the internet this picture is on my personal computer." Tim said "I don't care you can't view that in a public place. I'm going to have to ask you to leave. Close it up, laptop, your done." I left the library.

At 5:45pm I returned to the GRPL because I wanted to file a complaint where Tim was now at the Information Desk. I asked Tim for a complaint form. Tim said "We don't have a complaint form. All we have is a suggestion form."

I talked with Mr. Baldridge, assistant director. I told Mr. Baldridge Tim told me to leave the library for viewing a topless woman on my laptop. Mr. Baldridge said "It is our policy not to allow the viewing of nudity in the library. We have signs prohibiting the viewing of pornography. I asked Mr. Baldridge "was Tim authorized to tell me to leave the library"

**(Optional)**

**Name:** Donald Williams

**Phone Number:** (616) Message: 459-5076 Apt 57

**Zipe Code:** 49503

Exhibit - 1                    Page 1 of 2


GRAND RAPIDS PUBLIC LIBRARY

# Suggestion Form

**Date:** 9/1/06

**Name of Library:** Grand Rapids Public Library, 111 Library St, SE, Grand Rapid, Mi, 49503

**Comments:** for the day for viewing a topless woman on my laptop computers" Mr. Baldridge said " Yes Tim was authorized to tell you to leave the library for the day." I asked Mr. Baldridge "Wouldn't it have been more appropriate for Tim to have informed me of GRPL policy and asked me to stop viewing the picture. And, that if I continued to view the picture that I would then be asked to leave the library for the day." Rather than just telling me to leave the library for the day." Mr. Baldridge said " that something I'll take into consideration." I thanked Mr. Baldridge for his time and searched the library for signs prohibiting the viewing of pornography. I found NO signs prohibiting the viewing of pornography. From 9/21/05 to the filing of this suggestion I have not found a sign in the GRPL prohibiting the use of pornography, 8/30/06.

It is my suggestion that the GRPL give people a warning and inform them of your policy prohibiting the viewing of pornography before GRPL deprives citizens of their constitutional Rights to public facilities. Also, put up the NON-existant signs!

**(Optional)**

**Name:** Donald Williams

**Phone Number:** (616) MESSage: 459-5076 Apt 37

**Zipe Code:** 49503

page 2 of 2

# In The United States District Court
# For The Western District Of Michigan

Donald Williams,  ) Case No.: No.
                   )
       Plaintiff,  ) Affidavit Of Donald Williams
                   )
  vs.          )
                   )
Grand Rapids Public Library,  )
                   )
      Defendant,  )
_____ )

DEPOSITION
EXHIBIT
3
SB5-18-07

**COMES NOW**, the Plaintiff Donald Williams, with his Affidavit.

## AFFIDAVIT OF DONALD WILLIAMS

STATE OF  MICHIGAN  )
                    )
COUNTY OF KENT      )

Plaintiff submits the following testimony, evidence, and exhibits to this court in supportive substantiation of his claims. I _Donald Williams_, Of lawful age, first duly sworn upon oath, state and swears as follows: I am the Plaintiff, Donald Williams in the present case and I have personal knowledge concerning the matters set forth herein.

### A. Affidavit

1. On 9/21/05 at 2:15pm I, Donald Williams, was denied access and use of public library facilities by Tim, a Grand Rapids Public Library employee, who told me to leave the library for the day because I had viewed a topless picture of a women. At the time of the incident there where no signs in the Grand Rapids Public Library prohibiting the viewing of nudity and presently there still are no signs

Exhibit - 2

prohibiting the viewing of nudity in the Grand Rapids Public Library. Furthermore, at the time of the incident Tim did not warn me of Grand Rapids Public Library policy prohibiting the viewing of nudity in the library, of which, had he informed and warned me of Grand Rapids Public Library policy I would have complied. But, Tim, just harassed me, barred me from the library for the day, to leave the library just because he could or was authorized too.

2. I spoke with Mr Baldridge, assistant director, who informed me that Grand Rapids Public Library approved a custom or policy to prohibit the viewing of nudity in the library with signs posted throughout the library. And, who also informed me that Tim, Grand Rapids Public Library employee was implicitly authorized to bar me from the library.

3. The Defendant affirmatively and by omission, with regard to my Civil Rights to public facilities, did formulate a custom or policy which abridged my Civil Rights, Const. Amend. 14 § 1, and deprived me access and use of public library facilities. West v. Atkins, 487 U.S. 42, 48 (1988); Redding v. St. Edward, 241 F.3d 530, 532 (6th Cir. 2001). Defendant's assistant director and policy making official, Mr Baldridge, implicitly authorized and approved a custom or policy which deprives me Federally Secured and Protected Constitutional Rights and knowingly acquiesced in the unconstitutional conduct of the offending employee, Tim. Leach v. Shelby County Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989) (citing Hays v. Jefferson, 668 F.2d 869, 874 (6th Cir 1982).

4. Furthermore, the Grand Rapids Public Library has no form of redress for violation of Civil Rights. I spoke with Mr Baldridge who informed me that Grand Rapids Public Library has no complaint form. All Grand Rapids Public Library has is a suggestion form, see Exhibit A.

Dated This Tuesday, September 5, 2006

By:

**Donald V. Williams**
**44 ½ S. Division St., SE., Apt., 37**
**Grand Rapids, MI., 49503**

## B. DECLARATION UNDER PENALTY OF PERJURY

I declare (or certify, verify, or state) under penalty of perjury that the foregoing [Affidavit] is true and correct.  28 U.S.C. § 1746; 18 U.S.C. §§ 1621, et seq.

Dated This Tuesday, September 5, 2006

By:

**Donald V. Williams**

Further Affidavit Saith Not

## C. NOTARIZATION

Subscribed and sworn before me this ___5th___ day of ___September___,
___2006___.

_____
Notary Republic

WALTER L. MATHIS SR.
NOTARY PUBLIC, STATE OF MI
COUNTY OF KENT
MY COMMISSION EXPIRES Feb 2, 2012
ACTING IN COUNTY OF ___Kent___

My Commission Expires

Dated This Tuesday, September 5, 2006

By: